EDYTHE MORRIS SWOYER *v.* ALFRED P. SWOYER.
[No. 13, January Term, 1929.]

*Decided March 20th, 1929.*

The cause was argued before BOND, C. J., ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*W. Calvin Chesnut* and *Thomas J. S. Waxter,* with whom were *Joshua Clayton* and *Mathias C. Angelmier* on the brief, for the appellant.

*Wm. Pepper Constable* and *John D. Alexander,* with whom was *William T. Fryer* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this appeal were married in the Hotel Waldorf in New York on August 28th, 1919. The appellee, Alfred P. Swoyer, was at that time a widower about fifty-one years old, with a grown daughter, Mrs. Dorothy Nolan, of Philadelphia. He was in easy circumstances, he held a lucrative and important position, from which he received $27,000 a year, and he owned a farm known as the "Sandy Hill Farm" near North East in Cecil County, Maryland, which he took under the will of his first wife, who died in 1912.

The appellant, Edythe Morris Swoyer, born Helfenstein, who at that time was about twenty-six years of age, appears to have been a cultured and intelligent woman, and she too had some means, for at different times she advanced her husband, from her private funds, sums aggregating about $56,000.00.

The first years of their married life appear to have been, if not altogether happy, at least quiet and uneventful. Three children were born of the marriage, of whom two survive, Alfred P. Swoyer, Jr., aged six, and Edythe Allen Swoyer, aged four years. For a time the care of the children, the

calls of business, and the home appear to have filled their lives, and while there were from time to time difficulties and differences, there was no irreparable breach in their relations prior to 1923. As to their relations between 1923 and January, 1927, the evidence is conflicting. Swoyer said that although there were disputes they got along as well as "most married people," but Mrs. Swoyer said that, while they lived together for the sake of the children and appearances, all marital relations between them had ceased and were never resumed after December, 1923. He ascribed their separation to her extravagance and to a complete and unjustified change in her feelings towards him. She said that his excessive drinking, his gambling, and his incessant demands on her for money, made it impossible for her to live with him. But whatever the cause may have been, they did finally separate in January, 1927, and since that time have lived apart.

On the 21st of July following their separation, Swoyer received a telephone call from a Mrs. Joseph Lane Flannigan, and, in consequence of information obtained from her, he instituted an investigation into the relations between his wife and Mrs. Flannigan's husband, and as a result of that investigation, on October 18th, 1927, he filed the bill of complaint in this suit, in which he charged: "That the defendant made the acquaintance of a certain man named Flannigan of the City of New York, State of New York, and on a day or time and on divers days and times since the said marriage and prior to the time of the filing by your orator of this bill of complaint, the defendant committed the crime of adultery within the State of Maryland and elsewhere with the said Flannigan, who is also known as "Joe" and as "Mr. Lane," and with divers other persons whose names to your orator are at this time unknown." In that bill he prayed to be divorced a vinculo matrimonii from the defendant, and asked for the custody and guardianship of the two children. The defendant in due course answered the bill and denied the charge of adultery. On February 2nd, 1928, the appellee filed a supplemental bill, in which he charged that after the original

bill had been filed his wife had, on "divers days and times," "committed other adulteries with" the same Joseph Lane Flannigan. Those charges were also denied and on the issues tendered by those pleadings the case was heard by the Circuit Court for Cecil County, which, on August 7th, 1928, entered a decree granting the appellee an absolute divorce, and awarding him without qualification the custody of the two children. This appeal is from that decree.

The first question presented by the appeal is whether the evidence before the trial court supported its finding that the appellant was guilty of adultery.

The evidence relating to that issue is largely circumstantial, and the case turns rather upon the weight to be given to, and the inference to be drawn from, established facts, than upon their existence. Except as to a few disputed facts, therefore, it does not call for any extended or detailed discussion of the testimony, but it will be sufficient to state such facts as were either admitted or undisputed, to weigh the evidence as to those disputed, and to state our conclusions as to the inferences to be drawn from all facts which may be taken as established.

It is undisputed that between August 22nd, 1927, and October 17th, 1927, Mrs. Swoyer and Flannigan on four different occasions, although occupying separate rooms, nevertheless registered as guests at the Hotel Rennert in Baltimore City at the same time. It is also admitted that since December 29th, 1927, Flannigan has occupied an apartment at the Wyman Park Apartments on the same floor as an apartment occupied by Mrs. Swoyer, her mother, and her children. Those associations, and the incidents and circumstances connected with them, are the main and essential facts upon which the appellee relies in support of his charge that the appellant committed adultery. As in many similar cases, their meaning and significance depend very largely upon the antecedent history of the relations between the parties to them. If we accept her own statement, when Mrs. Swoyer met Flannigan in 1925, although she and her husband ostensibly lived together as husband and wife, all marital relations between

them had ceased in 1923, she had become disgusted with his personal habits and his continued importunities for money, and her affection for him, if not dead, was at least languishing. There was an effort made in May, 1925, to restore their former relations, but it came to nothing. She had gone to Atlantic City with their children, one of whom had been ill, and he was to join her there. While she was there she wrote him a number of natural and affectionate letters, which are wholly inconsistent with her statement that they were then on bad terms, but when Swoyer arrived he was, she said, so intoxicated that that attempt at reconciliation fell through, and they went on as before.

While affairs were in that state between her and her husband, she met Flannigan, then a floor walker in Altman's, a New York department store. Flannigan had been discovered by Mrs. Helfenstein, Mrs. Swoyer's mother, some time before, when she had gone to the store to make some purchases and he had waited upon her, and, for some reason not disclosed by the record, she was very favorably impressed by him. When she visited the store he looked after her wants, they soon were on very friendly terms, she expressed the greatest confidence in him, they dined together several times, she thought he was a "gentleman," and he spoke of her in his testimony as "Mother," and in ordinary course through his friendship with her Flannigan met Mrs. Swoyer. Judging him by his testimony, Flannigan is shifty, evasive, and unreliable, unconscious of the usual moral conventions, untruthful, and somewhat vain of the questionable notoriety incident to his attentions to Mrs. Swoyer. Without any resources which he was willing to disclose, except for some money he said he "borrowed" from an aunt, he lives in idleness and ease in an expensive apartment, apart from his wife, whom he left under circumstances which indicate that he deserted her. The friendship between him and Mrs. Swoyer grew steadily closer until 1927, when he left his employment, ostensibly to take a position in Chicago, although, in view of his testimony and his subsequent conduct, it is apparent that he left it to come to Maryland where Mrs. Swoyer lived.

His wife, Mrs. Dorothy W. Flannigan, testified that at Christmas in 1925 Mrs. Swoyer sent him two silk shirts and some neckties; that in January, 1926, she overheard a telephone conversation between Flannigan and some woman whom he addressed as "Edie," and he informed that person that he would "phone" her, and that five minutes later he called Mrs. Swoyer's home (she was then living in New York), and talked for about a half or three quarters of an hour, and that she heard him say "Edie, dear, is Alfie around," and "No, she is not around," "No, dear, she is not around. Do not worry." That when the witness, who was outside, came in, Flannigan told her he had been talking with his "sweetheart"; that on January 29th, 1926, she found in Flannigan's overcoat pocket one of Swoyer's cards, on which was written, in Flannigan's handwriting, Swoyer's home telephone number; that after several fruitless efforts she finally got Mrs. Swoyer at the number indicated on that card, and this conversation ensued: "I asked her if she knew that Mr. Flannigan was married. Mrs. Swoyer said, yes, she did. And I asked her if she thought it was the right thing for her to be stepping out with Mr. Flannigan. She said, Yes, she absolutely did. She said she felt the whole thing was just merely a lark. * * * A lark, and she said that the majority of women of today were running around, and I asked her to please leave my husband alone, and she gave me her word that she would. Q. Was there any talk about silk shirts and neckties on the previous Christmas having been given your husband by her? A. There was. I accused her of giving my husband silk shirts and neckties on the previous Christmas, and at first she said no, and when I told her that Mr. Flannigan said so, she admitted she had"; that on Palm Sunday in the same year, while she was in the room, Flannigan again called Mrs. Swoyer, and, while holding the receiver so witness could hear, told Mrs. Swoyer that he and his wife were "through," and she replied, "I am so happy." She further testified that at different times she found in Flannigan's pockets a receipt for a trunkful of silver made out to

Mrs. Swoyer, a receipt for a lot of china made out to her, and the professional card of her lawyer.

This testimony standing alone would be worth little, because it is more consistent with a conspiracy to blackmail than with the conduct of a man preparing to desert his wife to engage in a sordid amour. But because of corroborating circumstances it must be given some weight, for the issue in the case is not why appellant committed adultery, but whether she did in fact commit it. Therefore, whether Flannigan was treacherous or sincere in his conduct toward her cannot lessen her guilt, if in fact she did commit adultery with him.

Returning to Mrs. Flannigan's testimony, she said that on August 31st, 1926, she and her husband separated because of his "infatuation" for Mrs. Swoyer, but that they were reconciled on November 3d, 1926, and lived together until July 1st, 1927, when he left her finally, and she said on direct examination that when he left he told her he would return on the following Monday, but when recalled she said he did not tell her he would return.

A few days after that Flannigan, Mrs. Swoyer, and a Mr. Schlosstein, Mrs. Swoyer's attorney, appeared at the Sandy Hill Farm in Cecil County and, according to the testimony of Thomas S. Woods, who lived on the place and farmed it, Mrs. Swoyer told him that Flannigan was her New York lawyer, and she addressed him as "Joe." He was again seen at the farm on or about the 21st of July and again on July 28th, 1927. On the first two occasions he only stayed for the day, but on the last, when Mrs. Helfenstein also was there, he spent the night.

Two explanations are given for Flannigan's coming to Maryland, but none for his staying there. Mrs. Helfenstein said that conditions at the farm were "bad," that she was unable to go down there and that, having learned that Flannigan intended to go to Chicago, she asked him if he would not go to the farm, report to her the conditions there, and render what assistance he could. In weighing this testimony, it may be noted that Mrs. Helfenstein had herself no

interest in the farm, that it was improbable that Flannigan, an employee in a department store, had any knowledge of farming, and that he not only went on that occasion, but twice later, and that on the first occasion, instead of returning to New York, he went to Baltimore.

Flannigan in his direct testimony told the same story as to why he first went to the farm, but he elaborated it. He said that Mrs. Helfenstein told him that Mrs. Swoyer was at the farm and that "nobody else was down there," and she had nobody "to really look after the place." And he repeated his statement that he had given up his employment in New York to take a position in Chicago. That he had any intention of going to Chicago at that time is upon the whole record highly improbable. Having testified that when he came to Baltimore he had no resources other than some $300; that he roomed at the Rennert Hotel; that he had worked for four weeks at $25 a week, and had done no other work; that he had "borrowed" $2,500 from an aunt, he gave on cross-examination the following testimony: "Q. But you are not doing anything in the meantime to earn anything? A. I wouldn't say that. I have a position to go to. Q. You have what? A. I have a position to go to. Q. Where? A. In Chicago. Q. With whom? A. That I do not care to disclose at the present time. Q. Well, I won't press the question anyhow at this time. As far as that goes, we are entitled to know. Why don't you go, or why haven't you gone? A. Why haven't I? Q. Yes? A. As a matter of fact, the gentleman that has the position now was under contract, and it does not run out until a certain date." In addition to the inherent infirmity of this testimony, Flannigan was contradicted by his wife, who said that he planned to go to Chicago in 1926 and not 1927, when he left her. And the testimony of Helen V. Dorn, who was the telephone operator at the Hotel Irving when Mr. and Mrs. Swoyer lived there in November and December, 1926, and January, 1927, if true, would throw some light on not only his income, but also upon his reason for coming to Maryland. She testified that Flannigan would call up Mrs. Swoyer

four or five times a day, and that she would at times call him; that the frequency of the calls aroused witness' curiosity and she "listened in"; that Flannigan and Mrs. Swoyer appeared to be on the most intimate terms, that they addressed each other by familiar and endearing names, and that she made engagements to meet him outside of the hotel, and that witness actually saw her meet him on one occasion, and that several times she heard Mrs. Swoyer tell Flannigan "I have that fifty for you," which the witness "took for granted was money." It may be said that this testimony is of doubtful value; that the witness in listening to the conversation violated not only the rules of her employment, but of common decency, but it appears that what she did was sanctioned by her employer, and that her testimony is to some extent corroborated by the statements and conduct of the parties, as shown by other witnesses, some of whom at least are not impeached.

Mrs. Swoyer herself testified that she had in 1926 gone to a "movie" in New York with him, that she had taken lunch with him there, and on one occasion took dinner with him and her mother, and that she talked with him once in August and twice in September over the long distance telephone while she was in Cecil County and he in New York, and that she called him at his apartments as well as at the store at which he worked. She explained that by saying that she wanted him to send her an ice box, but the manager of the store where he was employed said that it did not handle ice boxes or refrigerators of any kind, and it seems odd that she should have made so much of securing an ordinary article which she could have ordered from any well-equipped furniture store in Baltimore, New York or Philadelphia.

It also appeared from Flannigan's testimony that he met Mrs. Swoyer in the summer of 1927 in Newark, New Jersey, and while, as will appear from the following extract, his testimony demonstrated his willingness to avoid facts, it was nevertheless uncontradicted, and for that reason must be given weight. On his cross-examination the following oc-

curred: "Have you ever been up in New Jersey with Mrs. Swoyer? A. I have been in New Jersey. Q. With Mrs. Swoyer? A. I couldn't say that, no. Q. Have you or not been up there with her in the last year? A. No, sir. Q. No, you say? A. I said no. Q. Have you ever been in Newark, New Jersey? A. I have been in Newark. Q. Have you ever been there with Mrs. Swoyer? A. I have seen her in Newark. Q. When? A. Last summer. Q. What part of last summer? A. The early part. * * * Mrs. Swoyer went to New York to see Mr. Simpson, I think, and she asked me if I would come up there to see what there was to it, that Mr. Swoyer had named me as co-respondent, or was going to. Q. When was that? A. Last summer. * * * Q. What hotel were you registered at in Newark? A. I was at a small little hotel. I do not know just where it was. Q. Give the name of it? A. I couldn't remember. * * * Q. Was it the Robert Treat? A. That I was at? Q. Where Mrs. Swoyer was? A. I couldn't say that. Q. Did you see her at the Robert Treat? A. I saw her in the lobby. Q. At the Robert Treat Hotel in Newark, New Jersey? A. Yes. Q. Did you take a room at the Robert Treat? A. Did I? Q. Mrs. Swoyer? A. I do not know whether she did or not. Q. Did you? A. No, sir. Q. Did you take a room at any other hotel in Newark? A. I did."

Much of the evidence relating to the facts to which we have referred is conflicting. It includes the testimony of witnesses of varying degrees of credibility, some of whom are palpably partisan and biased, some of whom are interested in repelling charges of disgraceful or immoral conduct, and some of whom were concerned in serving their own interests, but out of this bog these facts emerge as established beyond question.

In August, 1927, Flannigan, a married man, without occupation or visible resources, left his home and his wife under circumstances indicating that he deserted her, and went to live in a strange city, where he had neither friends, acquaintances, or any prospect of employment, and where there was

no possible reason for his presence except a desire to be near Mrs. Swoyer. At the same time Mrs. Swoyer, a married woman, separated from her husband, was living on her farm at North East, and between these two persons there had been for nearly two years a steadily growing intimacy which they called friendship, but which, by reason of the difference in education, refinement and social standing which respectively characterized them, was inconsistent with so passionless a relation, and shortly after he came to Maryland, there began the series of incidents which formed the final link in the chain of circumstances upon which the decree of the trial court rested, ard to which we will now refer.

On August 22nd, 1927, at half past one in the afternoon, Mrs. Swoyer registered at the Hotel Rennert, and was assigned room 112. At one forty-five that night, Flannigan also registered there and was given room 128. On that occasion she stayed at the hotel two days, and when she left Flannigan moved into the room she had occupied and stayed there a week, and on the the 31st of August he was charged with a call from that room to Mrs. Swoyer, who was then at North East. On September 6th, 1927, Mrs. Swoyer and Flannigan both registered, apparently at the same time, and were given respectively rooms 158 and 130 at the same hotel and remained there for two days. They registered there again on October 1st, 1927, apparently at the same time, and on that occasion he was given room 80 and she room 184, and they stayed one day, and finally, on October 17th, 1927, Mrs. Swoyer registered there and was assigned room 72. On the same day Flannigan also registered there and was assigned room 74. They respectively occupied these two rooms for two days, and after that Mrs. Swoyer left and Flannigan moved to another room, where he stayed for three weeks. These two rooms were communicating, but access from one to the other could only be had through a door which, according to the weight of the testimony, was locked and could only be opened by a pass key which was in possession of the hotel management. The assistant manager at the hotel testified

that he had seen Flannigan and Mrs. Swoyer together at the hotel on other occasions, when they were not actually registered there, and that he had also seen them together in her automobile which they parked in front of the hotel. John E. Cole, a colored bell-boy at the hotel, also testified that he had, when sent to Flannigan's room with ice and ginger ale, repeatedly seen Mrs. Swoyer there after she had "checked out" of the hotel, that, when she was there, at times the door would be locked and at others unlocked.

On November 2nd, 1927, Mrs. Swoyer, her mother, and her children, moved into the Wyman Park Apartments, and occupied apartment No. 304, and on the 29th of the following December Flannigan, then going under the name of "Lane," took apartment No. 325 on the same floor in the same building, and at the hearing in this case they still occupied these apartments. Whilst they were living in the apartment house, beginning on Friday, January 13th, and continuing until February 1st, Mrs. Swoyer and Flannigan, with few interruptions, were subject to the uninvited but nevertheless steady and vigilant scrutiny of a Mrs. Lillian M. Donaldson, a private detective, employed apparently on behalf of Swoyer to watch his wife and Flannigan. Mrs. Donaldson, after describing the technique of her espionage, went on to give its results. She said that to her knowledge Mrs. Swoyer visited Flannigan's apartment on various occasions, at times during the day and at others through the night, that on at least one of these occasions she was attired in somewhat unconventional negligee and that on that occasion she remained from eleven o'clock at night until after one; that on another occasion she came out of the door of Flannigan's apartment as he was apparently leaving it, and, while she was "very close" to the witness, said to him "Goodbye, sweetheart."

August T. Bichy, a deputy sheriff, served certain writs on Flannigan and Mrs. Swoyer on January 26th, 1928, and found them in their respective apartments, but when he returned a few minutes later he found them in Flannigan's apartment reading the writs.

The evidence of Cole, the bell-boy, Mrs. Donaldson, the private detective, Miss Dorn, the spying telephone girl, and Mrs. Flannigan, the deserted wife, uncorroborated, would obviously be of doubtful value, not only because of its inherent infirmity and the improbability of some of the incidents to which those witnesses testified, but because they were all contradicted in important particulars by other witnesses. But while it alone would be insufficient to support the conclusion that the appellant committed adultery, it is so far consistent with her conduct, as shown by other undisputed evidence, that it cannot wholly be disregarded, and taken in connection with other evidence, which is not contradicted, and giving due weight to the circumstance that the chancellor had the opportunity, denied to us, of noting the appearance and demeanor of the witnesses, we are unwilling to disturb so much of his decree as granted to the appellee a divorce *a vinculo matrimonii* from the appellant. It is of course possible that the appellant is guiltless of any wrongdoing, but courts cannot decide litigated issues on mere possibilities, but must decide them in accordance with what would appear to the guarded judgment of just and reasonable men of ordinary experience from all available evidence to be the truth. *Loveden v. Loveden,* 4 Eng. Eccl. Rep. 461. In cases of this character, where adultery is the basis of the relief prayed, it is not necessary to establish it beyond the possibility of error. *Barnett v. Barnett,* 144 Md. 189. But, while that is so, nevertheless, because of the character of the offence, the social stigma which attaches to the parties to it is so degrading and humiliating, and the legal consequences which flow from it so permanent and injurious to them, that courts will not accept as sufficient proof that it has been committed anything less than evidence so clear, satisfactory, and convincing as to inevitably lead the unprejudiced mind of a reasonable and prudent man to that conclusion. *Barnett v. Barnett, supra; Wendel v. Wendel,* 154 Md. 24; *Sterling v. Sterling,* 145 Md. 636; *Cashell v. Cashell,* 153 Md. 172; *Lang v. Lang,* 155 Md. 464, and cases therein cited.

Because of the furtive and clandestine nature of the offence, it seldom happens that it can be shown by direct evidence, nor is it necessary that it should be thus shown, for it may be inferred from circumstances, where such an inference is the only plain, natural and logical deduction to be drawn from such circumstances when they themselves have been established. *Sterling v. Sterling, supra; Lang v. Lang, supra.* In such an inquiry the two most important facts to be considered are, first, whether there was a disposition to commit adultery, and, second, whether there was an opportunity, for, if the two concur, ordinarily it will be inferred that adultery was committed. *Wendel v. Wendel, supra; Cashell v. Cashell, supra.* Nor can it be said that this rule is harsh or unreasonable, for it only reaches those who have, by an open and continued disregard of the usual moral and social conventions and decencies of life, shown themselves indifferent alike to their marital obligations and to the opinion of those who know of or are affected by their conduct, and, if the appellant has been injured by its application to the facts before us, she has only herself to blame, because by her reckless conduct she has made the conclusion we have reached necessary and inevitable.

The disposition of the two infant children is a more troublesome question. These small victims of human frailty and selfishness, though not parties to the cause, are the actual sufferers from the decree passed therein, for, as a result of it, they lose either a mother's constant care or a father's protection, or both. In considering the question of their custody, therefore, their welfare must be the sole consideration of the court, and its judgment should not be controlled by any consideration of merit or blame, punishment or reward, of either party to the cause, except in so far as such considerations may reflect upon their fitness to properly rear their children. And while the feelings and legitimate claims of the parents should be given some consideration, they are not controlling, but must yield to what appears to be for the best interests of the children, even though that involves awarding their custody to the parent whose misconduct is

the cause of the divorce. That principle was recognized by this court in *Pangle v. Pangle,* 134 Md. 170, and appears to be supported by the weight of authority elsewhere. *Nelson on Marriage, Divorce and Separation,* sec. 976; 19 *C. J.* 346, notes 47, 50. To the same effect is *Keezer on Marriage and Divorce,* sec. 589, although the cases cited in support of the text in that work are not in point.

Usually, where a divorce is granted on the ground of adultery, the custody of the children is awarded to the innocent party, not as a matter of punishment or reward, but because it is assumed that they will be reared in a cleaner and more wholesome moral atmosphere, but that practice is by no means arbitrary, nor has it ever crystallized into a fixed and definite rule. In *Handley v. Handley* [1891], Prob. 128, the court expressed a doubt as to the propriety of even allowing an adulteress any access at all to her children, but a few months later the same court, in *Witt v. Witt* [1891], Prob. 163, took the custody of a girl from the mother to whom it had been awarded under a decree of divorce based upon the father's adultery, and awarded it to the father, on the ground that he was then leading a respectable life and the mother was no longer a fit person to have charge of her. In *Commonwealth v. Addicks,* 5 Binn. 520, where the father was divorced from the mother on the ground of her adultery, the custody of two children of tender years was awarded to the mother on the ground that, at their age, they stood in need of care which none could give "so well as a mother," but two or three years later, although no change had taken place in the situation of the parties, it reversed that decree and awarded the custody of the children to the father, on the ground that they had then arrived at an age when they might well be affected by the erroneous views which their mother held on the obligations of the marriage contract. In *Haskell v. Haskell,* 152 Mass. 16, it was contended that, where the divorce was on the ground of the wife's adultery, the father was entitled to the custody of their children as a matter of right, but the court repudiated that contention, and held that no such right existed, and to

the same effect are *Brogna v. Brogna,* 67 Wash. 687, and *Richardson v. Richardson,* 36 Wash. 272.

But while there may be cases such as those cited, where unusual or peculiar circumstances justify taking the custody of the children of a marriage from the innocent parent and awarding it to one whose misconduct has been held sufficient to support a divorce on the ground of adultery, in the absence of such circumstances common sense and justice are opposed to any such course. For there is in most cases little reason to suppose that one, who before conviction cared so little for his or her children as to commit an offence condemned alike by the moral law and the law of the land, will after conviction be as well qualified to rear and train them as the spouse who is found to be innocent of fault or offence. Nor is it either just or reasonable to further injure and humiliate the innocent party to a marriage, who has lost his or her wife or husband, as the case may be, through the criminal intimacies of the erring spouse with some third person, by taking from him or her the children too. And that view is very clearly expressed in *Pangle v. Pangle, supra,* where this court, while asserting the right of the chancellor to award the custody of infant children to the adulterous spouse, insisted that the right should only be exercised where the evidence as to the wisdom and propriety of such a course was "very clear," and, so far as we know, it has not been exercised in any case found among the reported decisions of this court.

Returning to the facts of the case, it is reasonably clear from the record that Swoyer is a man of extravagant habits, with no permanent or fixed place of abode, who is required by the nature of his business to be absent from his family a great part of his time, that he drinks steadily, and that, if he assumes the custody of the children, much of the time they will necessarily be without the care or companionship of either father or mother. On the other hand he appears to be genuinely fond of them, and they of him, his moral character is not questioned, and he asserts that he is able to support them.

Mrs. Swoyer, until her unfortunate relations with Flannigan, appears to have been a faithful wife, and in the first years of her married life devoted to her husband. She turned over to him from time to time practically her whole fortune. She has at all times been a careful and attentive mother, and the children who are now in her custody are contented and well cared for.

Of the children themselves, the little girl is five years of age and the boy seven, and it may be said that the only home they have ever known is with their mother, and that they are too young to express any preference as to their custody, nor was there any attempt to have them do so.

Under such circumstances, the necessity for a decision as to their disposition is unfortunate, but, after giving the most careful consideration to the character of their parents, as well as to all the facts and circumstances attending their separation, we have arrived at the conclusion that their custody should be awarded to the father until the further order of the court; that the court should retain jurisdiction over them; that they should not without its permission be taken beyond the state, and that the appellee should at all times upon seasonable notice afford reasonable opportunities to the mother of access to them. In view of the open and notorious character of the relations between Mrs. Swoyer and Flannigan, of his character as disclosed by his own testimony, and of his frequent, familiar, and informal presence in the apartment she occupies, that conclusion is inevitable, although we have adopted it with reluctance. For at best it is a cruel thing to take these little children from the mother of whom they know no evil and whom they love, and place them in the care of strangers, for committing them to the care of their father can under the circumstances mean nothing else. But no other conclusion is possible, unless we can say that on the facts of the case the home of the mother, infested by the welcomed presence of the paramour, is a proper atmosphere in which to rear growing children, and we cannot go as far as that.

The decree will therefore be affirmed in part and reversed in part, and the cause remanded for further proceedings in accordance with the views expressed in this opinion.

> *Decree reversed in part and affirmed in part, and cause remanded for further proceedings in accordance with the views expressed in this opinion, appellee to pay the costs above and below.*

ADKINS, J., filed the following dissenting opinion:

I dissent on the question of custody of the children. I think the custody should be awarded to their maternal grandmother, with whom, together with their mother, they have lived for some years. I cannot assent to wresting these small children from a happy home, where they have been tenderly nurtured and, by the uncontroverted testimony, well brought up, and awarding them to a roving father of at least questionable habits, who for many years has not remained for any considerable time in one place or been able to spend much time with his family, and, by reason of the character of his business, cannot give any promise of real personal supervision and care to the upbringing of his children at a time when such supervision and care is most essential. The father is now a non-resident of this state. The case of *Pryor v. Pryor,* 146 Md. 683, where the facts bearing on the question of custody of children were identical in character with those in the present case, is ample authority for the view I entertain. That case expressed the undivided view of this court. See also *Allen v. Allen,* 142 Md. 701.

I would make the award conditional upon the present and continued exclusion of the alleged paramour from the place of residence of, and communication with, either the grandmother or the mother of the children. There is not the slightest suggestion of any misconduct of defendant with any other man.