KATHRYN TUNNELL BOWLER *v.* FRANK
WILLIAM BOWLER

[No. 8, October Term, 1944.]

*Decided October 27, 1944.*

494

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, BAILEY, CAPPER, and HENDERSON, JJ.

*L. Paul Ewell* for the appellant.

*Godfrey Child* for the appellee.

GRASON, J., delivered the opinion of the Court.

The appellant brings this appeal from a decree filed by the Circuit Court for Worcester County, in equity, granting the appellee a divorce *a vinculo matrimonii* on the ground of adultery. The proceedings were initiated when the wife filed a bill of complaint against her husband on the ground of cruelty and in driving her from their home on May 20, 1943. This bill was answered by appellee, in which he denied the material allegations of the bill and thereafter filed his cross-bill, alleging adultery. The wife, in her answer thereto, denied this charge. The case was tried on these pleadings in the lower court, who heard the entire evidence, with the exception of a witness whose deposition was taken and filed in the case.

These parties were married in the State of Virginia on July 27, 1938. Shortly after their marriage they moved to Pocomoke City, Maryland. The husband purchased a hotel in that city, known as "Parker House" and afterwards known as "Hotel Pocomoke." They came

to this hotel when they left Virginia. They have no children. The husband was engaged in buying and selling horses and mules and every Thursday he was away from home at night and every other week on Tuesday, Wednesday and Thursday he was away at night. His business required him to make long trips to purchase horses and mules and he could not return at night. These business trips by the husband started from about the time they came to Pocomoke City and continued until the separation of the parties. When at home, the husband was busily engaged in his business, going from the hotel in the morning to the stables and remaining away the entire day, with few exceptions, until evening, when he returned to the hotel, ate his supper, and generally retired about nine o'clock at night. His wife managed the hotel. She hired the help, purchased the provisions, deposited the receipts in bank and paid the bills.

In February, 1943, the husband came home and retired to an apartment on the first floor, which he and his wife at that time occupied. The wife was out when he came home that evening, having gone to a restaurant for the purpose of getting some clams. The husband looked out the window, about 11:30, and saw his wife leaning against the car of Francis Hickman, who was a town policeman. She stayed there for thirty-five minutes, laughing and chatting in free and easy manner with Hickman. He upbraided her about this when she came in and she said she was simply talking to the man in a friendly way and saw no impropriety in her behavior. After this the appellee, if not suspicious, was at least disturbed by the incident.

He testifies to some instances when he returned to the lobby after he had retired for the night and Hickman would be there and his behavior toward his wife was free and easy and met with his disapproval. His relations with his wife from February, 1943, until the separation on the 20th of May, 1943, were at times strained. He told her if she wanted Hickman she could

496

have him and that he would enter into an agreement of separation with her. At one time the relation between them was so strained they agreed to sell the hotel and divide the proceeds. The property was placed in the hands of Mr. Child, who actually advertised the hotel, but the sale was withdrawn. Appellee states that his wife's manner and disposition toward him changed and he was suspicious of her; but on occasions when he talked to her about his suspicions she always persuaded him that he was wrong, stating that he was the only man she wanted, and these talks always ended in what he thought was a reconciliation. He ordered Hickman to stay out of the hotel.

On a Sunday night in May, 1943, he and his wife were in their rooms on the second floor of the hotel and his wife was arranging to retire. There came a knock on the door, which he answered, and a woman whom he had never seen before asked to see his wife. He called to his wife and she didn't respond. He called a second time, when his wife, in negligee, appeared, rushed past this woman, went down the steps and out of the hotel into the street. While the wife was seeking Hickman, the woman, who was a stranger to the husband, told him that she was Hickman's wife and gave him certain notes (termed in the evidence "love notes"), which she had found in her husband's wallet. These love notes were admitted by the appellant to be in her handwriting. Mrs. Hickman told the appellee that his wife was breaking up her home. When Hickman learned, through the appellant, that his wife was in the hotel he went after her. Mr. Bowler stated he carried her bodily out of the hotel. Appellee further testified that after this incident he did not have marital relations with his wife.

On May 19th he was at Norristown, Pennsylvania, on business and he did not intend to return home until Friday and he was not expected home until Friday. Appellee testified that the scene caused by Mrs. Hickman's visit aroused and further strengthened his sus-

picion of his wife's relation with Hickman, and he determined to drive home from Norristown on the night of May 19th; that a business associate was with him, who drove the car, and when they arrived at the hotel, about five o'clock in the morning, his friend drove his (appellee's) automobile to his home, which was about twelve miles from Pocomoke City. He went upstairs to his room, which adjoined his wife's room. At six o'clock in the morning he heard a tap on his wife's door. The door which entered into the hall from the room he occupied was bolted and the door which entered the hall from the adjoining room, which his wife occupied, was latched. He got up, unbolted the door, and by the time he had opened the door his wife was at the door of her room and Hickman was standing there. He had his hat off, his holster and revolver had been removed, and he was in his undershirt. He asked him what he was doing there and cursed him. Hickman replied that he was only doing a favor, that his wife had asked him to call her at six o'clock and that he had permission to use the room across the hall to relax after his night's work. To which the appellee replied: "You only live three blocks from here, why don't you go home with your wife and baby and relax at home?" The appellee afterwards went into the room across the hall from his wife's room and there he found hanging up Hickman's pistol and holster and his shirt and cap. Hickman said at that time that he would not do him any more favors by calling guests who wanted to be awakened in the early hours of the morning. This was on the morning of May 20th and appellee told his wife and Hickman to get out. She left in her nightgown, drove her automobile to the home of friends, where she was received.

Elsie Manuel, a colored chambermaid, stated that she was in the kitchen on the morning of the 20th of May, 1943, when Hickman came in the back door. He asked her if the appellee was home and she told him that she did not think he was home and that Hickman then went upstairs. This witness, together with two other em-

ployees, Ruby Gertrude Riley and Iona Esham, testified that it was a common occurrence for Hickman to visit the hotel in the morning and go to a room on the second floor, where he, together with the appellant, remained until as late as after five o'clock in the afternoon. They had meals sent up to them, and whisky. She was seen in that room with Hickman, she in her nightgown, and he in his undershirt and shorts. After he left on these occasions the bed clothes would be soiled and there would be evidence that indicated that the bed had been occupied. There is evidence in the case by these witnesses that a sign would be hung out the back door with the legend, "Not in." That this was to indicate to Hickman that the appellee was not at home. That if the sign did not appear it meant that he was home. There was also testimony from these three employees that Hickman would come in the hotel after appellee had retired, and engage in acts of familiarity with the appellant; and that appellant would come out of her room in her night attire and kiss Hickman good night. These three women who worked in the hotel also testified that appellant was in a room with a soldier boy named "Monty" upon two occasions. There is also evidence in the case that the appellant gave Hickman presents and that when she took a trip out of town Hickman would likewise take a trip out of town. .

The testimony of these three women who were employed in the hotel is corroborated by Otho Taylor. He was on the police force of Pocomoke City and was, therefore, a fellow officer of Hickman. He testified that between the period of January first and May 20, 1943, he received a message from Hickman, which was delivered to him by Elsie Manuel, and in response to this message he went to room No. 4 on the second floor of the hotel, between three and four o'clock in the afternoon, to see Hickman. That when he knocked at the door Mrs. Bowler, the appellant, answered and he asked to see Hickman. Hickman asked him to come into the room. That in the room at the time were Hickman, the

appellant, and Ruby Riley. That Hickman had his top shirt off and was in his shorts and undershirt; that Mrs. Bowler, the appellant, had a night robe on and that Ruby Riley was dressed. That he was there about five or ten minutes, standing in the doorway; that Hickman asked him if he would work for him a while at night and that he did work for him that night until around eight o'clock.

Mrs. Hickman testified that she had begged her husband to give up the appellant; that before she entered his life he came home from work and stayed home, but that since his attention to appellant he would stay away until late and that when he came home it would be to fix himself up and go out.

Mrs. Gibbons, who occupied a room on the same floor with these parties, said she heard the conversation between Mr. Bowler and Mrs. Hickman; that Mrs. Bowler was breaking up her home; and that she saw Mrs. Bowler run down in her housecoat and saw her cross the street "to get Mr. Francis Hickman out of a car to get—I hate to say the word—to go get the bitch and bring her down." "Q. What did Mr. Hickman do? A. He went up and brought his wife down. When they were going out he said, 'You think you have done something.' She said, 'I told you I would do it.' Q. Is that all you heard her say? A. I heard her crying and saying that. And I think she gave him a note. She says, 'Here is a note for you to see, Mr. Bowler. Your wife is breaking up my home'." She said that at the time the door leading from the hall into Mr. Bowler's room was open and that her door was open.

There was further evidence that the appellant was seen at night in a car with Hickman upon three occasions. This testimony was denied by appellant, Hickman, the corespondent, and Mrs. Bell, who is an aunt of appellant and by whom she was raised. It was further testified that two of the rooms in which employees stated Hickman would spend the day with appellant were turned into a gambling parlor and that they were

used for that purpose from sometime in January until sometime in March.

Hickman testified, as well as other witnesses for appellant, that it was customary for town policemen to enter the hotel in the early hours of the morning and awaken guests who desired to be called and that that was the reason he went in the hotel. He further stated that he went in the hotel on an occasion when the husband was maltreating his wife.

Michael Monigresso, who is known as "Monty," denied he was ever in a room in the hotel alone with appellant.

It was further testified that the appellee, after the separation, attempted to settle the case out of court by paying his wife twenty-five hundred dollars.

The appellant admitted that she wrote the "love notes" and that she wrote them for Iona Esham who had cut her hand and said she couldn't write. That she was not told to whom the notes were written but was simply asked to write them and that they were written sometime about the first of March. Iona Esham denies that she asked appellant to write these notes and denies that she did in fact write them for her.

One note was addressed to "Darling." "I love you very, very much so please believe me. Come in tomorrow night so I can talk with you—don't go too far away tonight. I will be thinking about you only. I really mean it so. Love me, will you? As much as I do you."

The second note was addressed to "Honey." "I am going to bed and read. Went up town but didn't see you around—Will be out to say Goodnight later if you happen in—Til then I love you. I love you darling more than anything in the world, just you I want you, just you. Yours only—"

The last note reads: "Good night honey—I'll see you tomorrow. Will you take me riding with you tomorrow night, if—? I love you a whole world full—What say you???? You'd better be good."

Hickman's wallet was on the Frigidaire in his home. His wife explored the contents of the wallet and discovered these notes. She delivered them to the appellee in this case. There is not the slightest evidence in this record to show that Hickman paid any attention whatsoever to Iona Esham, nor that Iona Esham was ever infatuated with Hickman. She denies that she asked the appellant to write these notes. On the other hand these notes were written by the appellant, were delivered in some way to Hickman, and the evidence in this case certainly shows that it was not improbable that they were written by the appellant to Hickman and it is, in view of this record, highly improbable that Iona Esham asked the appellant to write these letters for her.

In considering the evidence we are aware that the burden of proof was upon the appellee to establish the allegation of his cross-bill by evidence so clear, unequivocal, satisfactory, and convincing as to raise in an unprejudiced mind a natural and reasonable inference of guilt. *Harward v. Harward,* 173 Md. 339, at page 356, 196 A. 318.

In the case of *Swoyer v. Swoyer,* 157 Md. 18, at page 30, 145 A. 190, at page 195, a case similar to the case at bar, the Court said:

"It is of course possible that the appellant is guiltless of any wrongdoing, but courts cannot decide litigated issues on mere possibilities, but must decide them in accordance with what would appear to the guarded judgment of just and reasonable men of ordinary experience from all available evidence to be the truth. * * * In cases of this character, where adultery is the basis of the relief prayed, it is not necessary to establish it beyond the possibility of error. * * * But, while that is so, nevertheless, because of the character of the offense, the social stigma which attaches to the parties to it is so degrading and humiliating, and the legal consequences which flow from it so permanent and injurious to them, that courts will not accept as sufficient proof that it has been committed anything less than evidence so clear,

satisfactory, and convincing as to inevitably lead the unprejudiced mind of a reasonable and prudent man to that conclusion."

We regret to conclude that the appellee, under his cross-bill, has met this heavy burden and that he was entitled to relief in this case. This being so, we need not consider whether the appellant has proved a case of cruelty against her husband under the original bill.

In *Saltzgaver v. Saltzgaver*, 182 Md. 624, 35 A. 2d 810, at page 812, Judge Melvin, speaking for this Court, quoted from the Appletofft case:

"By the great preponderance of authorities in this country, where the statutes authorize an absolute divorce or divorce *a mensa et thoro*, it is fully recognized that in a suit by one spouse for a cause entitling him or her to an absolute divorce, the other spouse cannot plead as a bar in recrimination a cause entitling him or her to a limited divorce."

We do not find that the appellee condoned the offense of the appellant.

"The burden of proof in respect to acts of condonation is on the defendant." *Sterling v. Sterling*, 145 Md. 631, 642, 125 A. 809, 813.

"The burden of proof as to the condonation of adultery is on the party asserting it." *Shafer v. Shafer*, 158 Md. 699, 148 A. 264; *Kremis v. Kremis*, 163 Md. 223, at page 232, 161 A. 255.

"Condonation requires a full knowledge of all the facts giving rise to the cause for divorce." *Harne v. Harne*, 141 Md. 123, 126, 118 A. 122, 123.

In this case we are of opinion that the appellant failed to prove that the appellee condoned her offense and neither do we think from this record that on the 20th of May, 1943, the appellee was in full possession of the facts and therefore he could not condone what he did not know. What Judge Pattison said, speaking for this Court in *Cashell v. Cashell*, 153 Md. 170, at page 179, 137 A. 904, at page 907, is appropriate here:

"The husband placed great confidence and trust in his wife, and was loathe to think that she was guilty of any wrongful conduct, though at times he could not resist suspecting her, but at such times she was able to convince him that she had done no criminal wrong. This, however, was mere suspicion, and not knowledge, and, after acquiring direct evidence of her guilt, he at no time thereafter made requests of her to grant to him such marital rights."

The appellee filed a motion to dismiss the appeal in this case, because of the failure of the appellant to comply with Rule 12A of this Court. Under Rule 10 of this Court and Article 5, Section 37, of the Annotated Code of Maryland, 1939, it was necessary that the transcript of this record be made and transmitted to this Court "within three months from the time of the appeal prayed." Rule 12A provides, in part:

"If it is necessary to include testimony in the record, it shall be the duty of the appellant to condense such testimony in narrative form so far as possible, and to serve a copy of such prepared testimony on the solicitor of the appellee. If the parties are unable to agree on what is to be included, or what is to be omitted, or what is to be condensed in such record of testimony, then the same shall be submitted to the Judge of the Court from which the appeal is taken not less than one month before the expiration of the time for filing the record in this Court, and he shall promptly determine what record of testimony shall be transmitted."

The order for appeal in this case was filed on December 24, 1943, and it was necessary that the record be transmitted to this Court within three months from that date. A narrative of testimony was prepared and served on the solicitor for appellee on February 22, 1944, at 5 P. M. A copy of the narrative of the testimony prepared by solicitor for appellant was filed with the Clerk of the Court of Worcester County on February 23, 1944, and came to the attention of the trial judge on February 25, 1944. The Judge decided on the narrative of testi-

mony contained in the record and the record in the case reached this Court within the time prescribed by Rule 10 of this Court. There is no objection by solicitor for appellee to the record as such, and no contention is made that the record is not fair. The motion to dismiss the appeal, then, presents merely an academic question, for the appellee was in no manner prejudiced by the way the record was prepared. The motion to dismiss the appeal under these circumstances, cannot prevail and must be dismissed. Nevertheless, some comment by this Court should be made.

Nearly two months after the appeal was taken the solicitor for the appellant served a narrative form of the testimony prepared by him on the solicitor of the appellee. Rule 12A provides, if the parties cannot agree on what is to be included in the narrative form of the testimony, the same *shall* be submitted to the Judge in not less than "one month before the expiration of the time for filing the record in this Court." The evidence taken in the lower Court consisted of over five hundred pages of testimony, and the narrative submitted reduced the testimony to one hundred and twenty-eight typewritten pages. This narrative was submitted to solicitor for appellee only two or three days before the time limited under Rule 12A, when in case of a disagreement the matter was to be submitted to the Judge for his determination. The rule in question does not prescribe a definite and certain time within which the narrative of testimony must be submitted to the opposing solicitor. And it would be difficult to prescribe a definite time when this should be done, without in some instances resulting in injustice. But, notwithstanding this, the narrative of testimony should be submitted in such time as to give the opposing solicitor a reasonable opportunity to check the matter and to see that the interest of his client is protected. And whether such an opportunity has been afforded to opposing solicitors will depend on the circumstances of each case. Rule 12A does not mean that the trial judge must make up the narrative of the testimony.

It is the duty of solicitors to diligently try to determine and agree to what the record of testimony should contain. In all cases, certainly there are parts of the testimony on which the most truculent solicitors can agree. It is only the testimony that cannot be agreed to that is to be presented to the Judge for determination within the time prescribed by the rule. And if solicitors allow the time for submission of the matter to the Judge for his determination to pass, the Judge may or may not determine the matter. It cannot be supposed that a busy trial judge is required, under this rule, to suspend all matter in his court and do the work that should primarily be done by solicitors, and if a failure to agree delays the presentation of the matter to the judge until after the time limited by the rule, a risk of the dismissal of the appeal by this Court for want of a proper record is assumed by the solicitor for appellant.

If a solicitor fails to submit testimony in narrative form in a reasonable time to the opposing solicitor and thus denies him an opportunity to consider the matter before the time limited under the rule when differences are to be submitted to the Judge, and if the Judge cannot, because of such delay, compose the difference or rule on the matter in time for the transmission of the record to reach this Court within the time prescribed by Rule 10 of this Court, this Court will dismiss the appeal.

Motion to dismiss appeal overruled.

*Decree affirmed, appellee to pay costs.*