## CHILLEMI *v.* CHILLEMI

[No. 84, October Term, 1950.]

258

*Decided February 14, 1951.*

Before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

Submitted on brief by *Wilbur R. Dulin* for the appellant.

Submitted on brief by *Thomas H. Patterson* and *James C. Christopher* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This litigation originated in the Circuit Court for Montgomery County when Eugene J. Chillemi, appellee, instituted suit against his estranged wife, Lulu R. Chillemi, appellant, to enjoin her to reconvey his former home in Bethesda to him and her as tenants by the entireties, as it was owned before he conditionally relinquished his interest therein. The wife then entered a suit for a divorce and custody of their adopted daughter, and the husband filed a cross-bill. The cases were consolidated and tried together.

The parties were married in Rockville in 1937. In 1941 appellee received a commission as Lieutenant in the United States Army, and when he was ordered to Florida, Colorado, Louisiana and Oklahoma, his wife accompanied him. They had no children, and in September, 1945, they adopted a daughter slightly over one year old. In January, 1946, while appellee was stationed as a Captain in the Army in Washington, they purchased the home on Irvington Avenue, which is now in controversy. In February appellee was honorably discharged from the military service and was given a civilian position in the War Department.

The marital life became increasingly discordant after a quarrel on July 4, 1946. On that day appellant became enraged at her husband because he refused to accompany her to a party in Southern Maryland. Appellee described the quarrel as follows: "So she told me she was going alone, and I told her to go ahead. And she told me just prior to her departure that she wanted me out of the house when she came back. I told her that I wasn't going to leave. That evening when she came back, * * * I was in the basement ironing some shirts, and * * * she came downstairs alone and she told me that she had ordered me out of the house before she left, and wanted to know why I wasn't out. I told her I was doing my laundry * * * and with that, I don't recall if it was a beer bottle flew at me first or a small China lamp, which-

260

ever it was I caught that first, and then I caught either the beer bottle or China lamp that came at me second."

After this episode, appellant consulted an attorney in Washington with the object of inducing her husband to give her complete title to the home in Bethesda. Her husband declined to relinquish his interest in the property. Early in September, 1946, there was a change in the situation. He received an order from the Office of the Chief Engineer to go on a mission to Japan and China. As the Chinese Communists were at war with the Nationalist forces at that time, his mission promised to be a dangerous one. In view of the uncertainty of his return, he consented to execute a deed conveying the home to his wife, but, according to his version, on condition (1) that she would not record the deeds until such time as he "should have been reported missing, killed, or had failed to return," and (2) that if he should return, the deeds would be returned and destroyed. On September 10 he brought the deeds to his wife and that evening they executed before a notary public a deed conveying the title to a third person, who in turn executed a deed conveying it to appellant, and appellee also executed a release of his right of dower. A few days later appellee started on his trip to Japan.

After completing his work in Japan, appellee did not go to China, but returned to the United States much sooner than he had expected. When he arrived home on December 8, his wife demanded that he must not sleep in her bedroom. In order to avoid an argument, he took the back room. He testified that he asked his wife several times to return the deeds, but she refused to give them back. She recorded them on January 7, 1947.

Appellee also testified that he became increasingly suspicious of his wife's relations with other men. In addition, her temper became intolerable. On January 18, 1947, when they called to see appellee's mother, who resided in an apartment on Monroe Street in Washington, appellant threatened to kill appellee if he went back home. Appellant admitted on the stand: "I told his

mother * * * to keep Gene there because, if we both went home, one of us wouldn't wake up in the morning." The chancellor asked appellant what she meant by that statement. She sullenly replied: "What I meant I don't know. I just merely told you what I said." The chancellor then asked her whether it indicated that she might have been tempted to dispose of her husband. She then declared: "That was in my mind, yes."

Appellee, when asked whether he believed his wife might murder him, replied: "Under the circumstances, I did believe it, because she had made similar threats on several occasions previous to that, and whether or not this one was a bluff, I wasn't going to take a chance." He declared that his wife had attacked him on a number of occasions, and had broken five pairs of his eyeglasses.

Fearing this threat, appellee decided to accept his mother's invitation to remain in her apartment. He has not lived with his wife since her warning on January 18, 1947. For some time he has held a position at the Engineers' Reserve Laboratories, Fort Belvoir, Virginia. Occasionally he has called at the house in Bethesda to see his adopted daughter. One evening he decided to wait for his wife, who was employed in a restaurant in Washington. It was nearly 3 o'clock in the morning when she appeared. When an automobile stopped in front of the house, appellee removed his glasses and coat and went outside. When he reached the car, his wife was in the arms of a married man named Foley. In describing the scene, appellee testified: "With a word of rancor, quite in excess I imagine, I opened the door and told her to get out of the car. * * * I told her to get out or I would drag her out, and she finally got out. When she got out of the car, I went in after Foley, and he and I more or less had it out."

Appellant admitted that she occasionally rode in an automobile after midnight with a bartender named Fink. She also admitted that she "went with a guy for two years named Dixon." The climax came when Dixon stayed all night with appellant, and appellee, calling at

the house the next morning, found him asleep in the bed in the back room.

The chancellor decided that the wife's conduct justified the husband in abandoning the home in Bethesda. He accordingly passed a decree granting the husband a divorce *a vinculo matrimonii*, awarding him the custody of the adopted daughter, and declaring the deeds null and void. The wife is not complaining here of the divorce. She is appealing only from the award of custody and the annulment of the deeds.

First, we sustain the award of custody of the child to appellee. The Maryland divorce statute provides that in all cases in which the care and custody of the children of the parties forms part of the relief prayed, the court shall have power to order who shall have the guardianship and custody of the children and be charged with their support and maintenance, and may at any time thereafter annul, vary or modify such order in relation to the children. Code 1939, art. 16, § 41. If the parents are divorced and a dispute arises as to the custody of the children, the natural feelings and legitimate interests of the parents should have some consideration, but the paramount consideration is what will be for the best interests of the children and most conducive to their welfare. *Swoyer v. Swoyer*, 157 Md. 18, 145 A. 190.

In the instant case we give weight to the fact that the chancellor found, not only that the wife was guilty of wrongs entitling the husband to an absolute divorce, but also that the wife's employment, and her improper conduct and fiery temper would not conduce to a proper environment in which to raise the child, and that it would be more desirable for the child to live with her adoptive father and grandmother. It was urged by appellant that no improper conduct can be implied from the fact that she rode in an automobile with one male friend or another after midnight. But we think the evidence is sufficient to sustain the chancellor's decision that the wife is not the proper party to have custody of the child. Her fondness for midnight shows, the fre-

quency of her return home between 2 and 3 o'clock in the morning, her questionable conduct, and her uncontrollable temper, all militate against her claim for custody of the child. The testimony was taken in open court. The chancellor had the advantage of seeing and hearing the witnesses and observing their demeanor on the stand. The husband's testimony was amply corroborated. For instance, the occupancy of his bed by Dixon when the little girl was at home was corroborated by the wife's sister.

The wife testified that when she worked in the restaurant in the daytime four days a week, the child was in school, and when she worked two nights a week, her sister stayed with the child. She urged that the house in Bethesda is larger than the apartment in Washington. But the husband holds a position with the Government, and if the apartment proves to be too small, he may be able to find a larger home. The grandmother has taken care of the child on numerous occasions, and therefore the child will not be in strange surroundings.

We now come to the question whether the deeds which the husband delivered to the wife should have been annulled. It has long been held at common law that there cannot be a valid delivery of a deed to the grantee named therein upon a condition not expressed in the deed. The ancient rule that the mere transfer of a deed from the grantor to the grantee overrides the grantor's explicit declaration of intention that the deed shall not become operative immediately is a relic of the primitive formalism which attached some peculiar efficacy to the physical transfer of the deed as a symbolical transfer of the land. 9 Wigmore on Evidence, 3d Ed., secs. 2405, 2408; 4 Tiffany, Real Property, 3d Ed., sec. 1049. In England in ancient times there could be no change of possession of land until a livery of seisin had taken place. A knife was produced and a piece of turf was cut, and the turf was handed over to the new owner. Later, under the Roman influence, the written document came into use. These documents, which few people had the art to manu-

facture, were regarded with mystical awe. Just as the sod had been taken up from the ground to be delivered, so the document was laid upon the ground and then solemnly lifted and delivered as a symbol of ownership. In this way the principle developed that the delivery of the deed was the mark of finality.

Through the centuries the courts have struggled to break away from this strict formalism. The first sign of flexibility in the rule was the concession that the delivery of a deed may be conditioned upon the performance of some act or the occurrence of some event, provided that such conditional delivery, known as delivery in escrow, is accomplished by having the deed placed in the hands of a third person for subsequent handing to the grantee. But the concession of conditional delivery was not allowed where the deed was placed directly in the hands of the grantee in anticipation of some future event. Thus this Court, recognizing the rule that a deed cannot be delivered in escrow to the grantee, said in *Buchwald v. Buchwald,* 175 Md. 115, 120, 199 A. 800, that if a deed absolute on its face is deposited by the grantor with the grantee, to be held by the grantee in escrow, such a deposit becomes a delivery which operates to vest the title in the grantee immediately.

But there is actually no logical reason why a deed should not be held in escrow by the grantee as well as by any other person. The ancient rule is not adapted to present-day conditions and is entirely unnecessary for the protection of the rights of litigants. After all, conditional delivery is purely a question of intention, and it is immaterial whether the instrument, pending satisfaction of the condition, is in the hands of the grantor, the grantee, or a third person. After the condition is satisfied, there is an operative conveyance which is considered as having been delivered at the time of the conditional delivery, for the reason that it was then that it was actually delivered, although the ownership does not pass until the satisfaction of the condition. We, therefore, hold that it is the intention of the grantor

of a deed that determines whether the delivery of the deed is absolute or conditional, although the delivery is made by the grantor directly to the grantee.

In the case before us the two deeds and the release of dower were delivered conditionally. The husband testified that, before leaving on a dangerous mission in the Orient, he handed the instruments to his wife, but it was understood that the deeds were not to be recorded until such time as he "should have been reported missing, killed, or had failed to return." The wife's version is different. She testified that she promised that when her husband returned home, she would tear up the deeds and let the original title stand upon condition that he would change into a better man. In any event, the wife admitted that her husband did not intend to divest himself of all control over the property. It is undisputed that it was the intention of the parties that the instruments were not to be recorded while the husband was on his mission. The instruments were not recorded by the wife until January 7, 1947, a month after the husband returned home.

As we have indicated, the title to property described in a deed delivered conditionally does not pass as long as the condition attached to the delivery of a deed is not satisfied. Therefore, when it becomes assured that the condition will not be satisfied, the deed loses all possible efficacy. In such a case the grantor will ordinarily desire to have the deed returned to him, in order to preclude the possibility of its being used afterwards to his detriment. 4 Tiffany, Real Property, 3d Ed., sec. 1053. In view of the presumption of delivery which naturally arises from the grantee's possession of the deed, the burden rests upon the grantor, when he has delivered the deed to the grantee, to show (1) that the delivery was conditional, and (2) that the condition was not satisfied.

In this case the chancellor believed the grantor's version of the delivery, and held that he sustained the burden of proof. The chancellor also found that, even

266

under the grantee's version, her misconduct was so unbearable as to make it impossible for the grantor to live with her. Such was the decision in the suit for divorce, and there was no appeal from that decision. We consider the evidence sufficient to sustain the annulment of the instruments.

*Decree affirmed, with costs.*