## GRACE HOCKMAN *v.* PAUL B. HOCKMAN
[No. 28, October Term, 1946.]

*Decided December 12, 1946.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*John L. Clark* and *Joel J. Hockman* for the appellant.

*Jerome A. Loughran* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Grace Hockman, a resident of Ellicott City, is appealing here from a decree of the Circuit Court for Howard County granting her husband, Paul B. Hockman, a divorce *a vinculo matrimonii* on the ground of adultery and dismissing her cross-bill charging desertion.

This is the second case she has brought to this Court. In 1944, when she and her husband separated, she was sued for a divorce *a mensa et thoro* on the ground of desertion, and she filed a cross-bill alleging that her husband had treated her with cruelty by forcing her to submit to sexual intercourse when she was ill, thereby causing her physical injury. The chancellor awarded the partial divorce to her husband; but in March, 1945,

the Court of Appeals reversed the decree and ordered the chancellor to grant a decree in her favor and award her $18 a week alimony. *Hockman v. Hockman,* 184 Md. 473, 41 A. 2d 510. The present suit for absolute divorce was instituted in January, 1946, and the chancellor in his decree on April 30 relieved the husband from payment of alimony after that date.

At the trial of this case it appeared that Mrs. Hockman has been living with her daughter Eleanor and her husband, Thomas Croftcheck, in an apartment on the third floor of the Caplan Building on Main Street. Also living in this apartment was her sister, Arbutus Cameron, a telephone operator, 28 years old, who is separated from husband but not divorced. Hockman testified that about 1:30 o'clock on the morning of October 1, 1945, he saw Mrs. Cameron and a man enter the apartment house, and about two hours later the man came out with another man, who, he afterwards learned, was Harry Ridenbaugh, of Oella. His identity was traced in the office of the Commissioner of Motor Vehicles by means of the license number of a Pontiac automobile, which Hockman saw in front of the house on the night of October 22. On that night Mrs. Hockman and Ridenbaugh were on the back seat of the automobile, and when Hockman appeared the driver drove away. About 20 minutes later the car returned, but when the driver saw Hockman again he drove off the second time. When they returned the next time and found Hockman still there, Mrs. Hockman and her sister finally got out of the car and went into the house.

Hockman employed a detective, Nelson J. Cooney, of Baltimore, to make an investigation. Within three weeks the detective saw Mrs. Hockman and Ridenbaugh together on six occasions: (1) On the night of November 10 he saw Mrs. Hockman and Mrs. Cameron enter Ridenbaugh's car, and he followed them to Marino's Tavern and saw Ridenbaugh kiss Mrs. Hockman twice. The women did not come home until after 1 A. M. (2) On the night of November 17 he followed Ridenbaugh and

Mrs. Hockman out Rolling Road to Migan's Tavern on Liberty Road. They parked behind a number of other automobiles some distance from the tavern near an ice cream parlor, which was closed at the time, and they stayed in the car hugging and kissing for about 25 minutes. They then had a drink in the tavern, and when they came out they stayed in the car for about 15 minutes. They then drove back to Ellicott City, where they met Mrs. Cameron at about 10 P. M., and all three motored to another tavern, where they stayed until after midnight. (3) On the night of November 22 he saw Mrs. Hockman and Mrs. Cameron enter Ridenbaugh's car and he followed them to Baltimore. Ridenbaugh parked on Paca Street and the three walked to Keith's Theatre, and after the show they motored to a tavern at Edmondson Avenue and Franklintown Road, where they stayed until 12:30 A. M. (4) On the night of November 24 he followed them to Marino's Tavern, about seven miles west of Ellicott City. He saw them hugging and kissing in the automobile for about 40 minutes. They then went into the tavern where they drank and played the music box. They returned to the automobile and hugged and kissed again. He followed them back to Ellicott City, where they picked up Mrs. Cameron and then drove to another tavern, where they stayed until 12:30 A. M. (5) On the night of November 25 he followed Ridenbaugh, Mrs. Hockman and Mrs. Cameron to Baltimore. This time they parked on Fayette Street and walked to the Hippodrome. He waited until they came out of the theatre, and then followed them out Edmondson Avenue to the tavern on Franklintown Road. (6) On the night of December 1 Ridenbaugh took Mrs. Hockman and her daughter and son-in-law to Baltimore. He trailed them to Getz's Restaurant on Frederick Avenue, where they stayed until 11:30 P. M.

Hockman testified that on the night of January 2, 1946, he met his wife on Main Street and told her he knew that she was keeping company with a married man, and she retorted that "her eighteen months were up and she

could do as she pleased and go where she pleased." Later that night he saw her in Ridenbaugh's car. He also testified that about midnight on January 16 his wife was in Ridenbaugh's car in front of the apartment house, and when Ridenbaugh saw him he drove away and parked on Westchester Avenue. Hockman drove back to the apartment house and waited until 1:30, and she had not yet returned. Even after January 25, when suit for divorce was instituted, Ridenbaugh continued his nocturnal motor trips and his visits in the apartment.

The law is clear that the charge of adultery in a suit for divorce may be established without direct evidence of the commission of the act. It is rarely possible to obtain evidence of its commission by the testimony of eyewitnesses. In considering circumstantial evidence, however, the chancellor should exercise care and circumspection and should not hold that the offense has been committed except upon evidence so clear and satisfactory that it would convince a reasonable and unprejudiced man of the guilt of the accused. *Sterling v. Sterling,* 177 Md. 683, 9 A. 2d 214; *Renner v. Renner,* 177 Md. 689, 12 A. 2d 195, 127 A. L. R. 674. The circumstantial evidence required to prove the charge of adultery must show (1) a disposition of the defendant to commit it, and (2) an opportunity to commit it. The mere association of a man and a woman, however frequent and extended it may be, is not of itself sufficient to prove the charge of adultery. As we said in *Renner v. Renner,* 177 Md. 689, 12 A. 2d 195, 127 A. L. R. 674, a man and a woman may be brought together daily for the transaction of business, or may live in the same house, or may be seen frequently in each other's company, but the offense is not proved by any such circumstances unless there is some evidence of conduct or speech indicating an adulterous disposition.

Mrs. Hockman claimed that there was always someone else in the apartment at night; but the co-respondent also visited her during the day, when the other three occupants were at work. We have no doubt that she had

ample opportunity for the commission of adultery. On the previous appeal it was shown that she underwent operations for tubal pregnancy, adhesions of the stomach, and gall bladder trouble, the last in 1942. But while she claimed in the present case that she was physically unable to have sexual intercourse, there was no evidence to substantiate this bald assertion. She admitted that she accompanied Ridenbaugh to a tavern on the night of November 17, to Baltimore on the night of November 22, to Marino's Night Club on the night of November 24, to Baltimore on the night of November 25, and to Getz's Restaurant in Baltimore and afterwards to her apartment on the night of December 1. She testified that she may have gone motoring once with Ridenbaugh alone, but she was not certain. Yet the proprietor of Marino's Tavern testified that they came to that tavern unaccompanied on a number of occasions. Several times, the proprietor disclosed, they stayed so late that he had to turn off the lights to get them to leave. In our judgment the evidence shows that Mrs. Hockman had an adulterous disposition. She swore that she had never kissed the co-respondent more than once, and that was merely a friendly kiss, but the testimony of Hockman and his witnesses was entirely different.

It is unquestionably true that the testimony of private detectives is not entitled to any more weight than that of the defendant and co-respondent, where they conflict. The reason for this rule is that they are all interested witnesses, the detectives to justify their employment by finding what they are employed to find, and the defendant and co-respondent to establish their innocence. *German v. German,* 137 Md. 424, 112 A. 789. Generally, the testimony of detectives is not reliable when it is uncorroborated by any circumstance in the case and does not connect the defendant with the offense. *McCleary v. McCleary,* 140 Md. 659, 663, 118 A. 133; *Bailey v. Bailey,* 181 Md. 385, 30 A. 2d 249; *Steinla v. Steinla,* 178 Md. 367, 13 A. 2d 534. But in this case the detective, who has an established detective agency in the Equitable Building, was accom-

panied by his wife when he followed Mrs. Hockman and Ridenbaugh on their motor trips, and the investigation was done thoroughly. For instance, on the night of November 17, before Mrs. Hockman and Ridenbaugh entered the tavern, Cooney and his wife both observed Ridenbaugh take a handkerchief from his pocket, and Mrs. Hockman take it from his hand and wipe her lips and his with it, and then straighten her blouse. The detectives followed them into the tavern and watched them at close range. Both observed Mrs. Hockman's coat and dress and flesh-colored blouse. Mrs. Cooney identified the coat and dress as those Mrs. Hockman was wearing in the courtroom. In fact, the testimony of the detectives in its general outlines was admitted to be true, and there was no substantial denial except as to the hugging and kissing.

The evidence also establishes the adulterous disposition of the co-respondent. Irrespective of the testimony of the detectives, it is evident that the co-respondent was fond of Mrs. Hockman. Here is a man with a crippled wife and two children. Yet every week-end when his work was over, and also during the week whenever he had the opportunity, he spent his time and his money upon a woman whom he had never known until 1945, and frequently went into her rooms at midnight. He went to her apartment on Christmas Day, and in 1946 continued to take her to taverns and night clubs and visit her apartment, even after Hockman had instituted suit for divorce. In fact, he told the court he was in her apartment on the night before the trial of the case. Mrs. Hockman was uncertain and evasive in her testimony. She testified that she kept a diary, but when she was asked whether she had ever been to Migan's Tavern, she said, "I don't know." When asked whether she was in Ridenbaugh's car on the night in October when her husband approached, she said she could not remember. She admitted that she went to Marino's Night Club with Ridenbaugh, but she swore that she did not know how many times she went there with him. Ridenbaugh was

likewise evasive. When asked how many times he went to Mrs. Hockman's apartment, he replied, "I didn't keep no account of it." However, he admitted that it was quite a number of times. When asked to explain the purpose of so many visits at midnight to a married woman's apartment, he said, "Just to talk. That was all."

The Court cannot accept the story of Ridenbaugh, a vigorous man 45 years old, who leaves his wife in her wheel chair in Baltimore County to buy food and drinks for another woman at restaurants, taverns and night clubs, that he has been visiting her apartment at midnight only for the purpose of conversation. We are of the opinion that the evidence was sufficient to warrant the decree of divorce. The fact that a woman, who is receiving alimony from her husband and has never obtained an absolute divorce, is so indifferent to the proprieties of life and the opinions of others as to show affection for a new acquaintance of dubious habits, accompany him to places where liquors are sold, and entertain him in her apartment after midnight, gives evidence of an adulterous disposition, which may be accepted as proof that she committed adultery when she had the opportunity. There is a possibility, of course, that Mrs. Hockman has not committed the offense with which she is charged, but the courts of equity cannot decide issues of this kind on mere possibilties, but must decide them in accordance with what would appear to be the fact from all the evidence in the guarded judgment of just and reasonable men of ordinary experience. *Swoyer v. Swoyer*, 157 Md. 18, 30, 145 A. 190; *Bowler v. Bowler*, 183 Md. 493, 501, 39 A. 2d 538. As we said in *Dougherty v. Dougherty*, 187 Md. 21, 48 A. 2d 451, we do not consider the acceptance of circumstantial evidence to prove adultery as harsh or unreasonable, for it applies only to those who, by an open and continued disregard of the usual moral and social conventions and decencies of life, have shown themselves indifferent to their marital obligations and to the opinion of those who know of their conduct. If a defendant, like Mrs. Hockman, is affected

by the application of the rule and loses her alimony, she has only herself to blame because she has made the decision of the court unavoidable by her reckless conduct. The chancellor had the opportunity to see all the witnesses and to pass upon their credibility, and we see no reason that would justify us to disturb his findings.

*Decree affirmed, with costs to appellant.*