## BLANKENSHIP *v.* BLANKENSHIP

[No. 355, September Term, 1964.]

500

Decided July 14, 1965.

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY and BARNES, JJ.

*J. Ambrose Kiley* for appellant.

*Jerrold V. Powers,* with whom were *James R. Bucher* and *Sasscer, Clagett & Powers* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

This is an appeal from a final decree of the Circuit Court for Prince George's County dated October 14, 1964, granting an absolute divorce as prayed to Garland W. Blankenship, appellee, and dismissing the cross-bill of complaint of Sadie B. Blankenship, appellant. The wife contends: 1) that there was no legally sufficient corroboration of the husband's testimony; and 2) that, regardless of corroboration, the chancellor was clearly wrong in finding the evidence to be sufficient to establish the fact of the wife's adultery. We find no substantial merit in either contention.

On August 1, 1963 the plaintiff-husband filed a bill of complaint alleging that the defendant-wife had deserted him on February 27, 1963; he prayed for a divorce *a mensa et thoro* and for a determination of the ownership of certain personal property. On August 21st the defendant answered the bill and filed a cross-bill alleging cruelty of treatment, excessively vicious con-

duct, and a constructive desertion by the husband as of February 27, 1963. She also prayed a partial divorce, a determination of the ownership of various personalty, an in addition, for alimony *pendente lite,* for a reasonable counsel fee, and for other and further relief. The husband filed a general denial to the cross-bill. Much later, on May 22, 1964, the husband filed a supplemental bill of complaint, with the permission of the court, alleging that the wife had committed adultery on April 11, 1964 "and at various times prior thereto," and prayed for a divorce *a vinculo matrimonii.* The allegation of adultery was denied by the wife.

The parties to this litigation were married in 1955. This marriage was the second for each; no children have been born to them. Several separations between the parties occurred prior to the final separation of February 27, 1963; (two equity suits had been filed in 1962 but both had been voluntarily dismissed). As a result of one of these separations, Mr. Blankenship, the owner since 1954 of Cavalier Radio and Television Sales & Service, purchased a second business, known as Carrollton-Lanham Radio & TV, for his wife. He explained that his wife liked the radio and television-set business but insisted on working apart from him during the day. All of the assets of the Carrollton shop were titled in Mrs. Blankenship's name.

On February 27, 1963 the husband returned home about 5:30 P.M. to find the wife, and all of her clothes, gone. Testimony revealed that the night before had been the culmination of a long series of quarrels and fighting, physical as well as verbal, the details of which need not be gone into here. In June, 1963 the husband came back to the apartment to find that the front door had been "smashed in," the storm window, pried open, and that almost all of the furniture had been removed. The police later found that the furniture had been taken by the wife. In defense Mrs. Blankenship said that Sheriff William J. Jamieson, Sheriff of Prince George's County, had advised her to take this action. During this entire period Mrs. Blankenship lived apart from her husband, in a succession of apartment houses. Her original decision to leave Mr. Blankenship, she conceded, had also been made on the advice of Sheriff Jamieson.

Several months prior to the filing of the supplemental bill of

complaint the husband began to survey his wife's apartment, usually in the evenings, the purpose according to him being to discover "why a good marriage went bad." On at least two occasions, March 23rd and April 10th, he was joined by his brother, John H. Blankenship, and by a friend, Joseph R. Robertson, who was a park policeman and a deputy sheriff of Prince George's County. A very light-colored Falcon station-wagon with an antenna on its roof was observed by all three men in front of the wife's apartment. The husband testified on cross-examination that he had seen the automobile at least fifteen to twenty times between the two dates mentioned above and assumed that its owner lived in the apartment building. The chronicle of the events of the late evening and early morning hours of April 10-11, the time during which the wife is alleged to have committed adultery, was stated and evaluated by the chancellor as follows:

"Turning to the night of April 10th-11th, the husband observed the wife's apartment and at approximately 1:50 A.M. in the early hours of the 11th, the wife was observed walking toward her apartment in company with a man who was holding hands with her and were seen to enter therein. After this, the husband left the premises and went to a service station and called his brother and a Mr. Robertson, both of whom arrived on the scene between 2:15 and 2:25 A.M. All three observed the premises until approximately 3:15 A.M., when a man was observed coming through the only entrance to the apartment building, and walking rapidly toward his car. The three then confronted the man, later identified as the Sheriff, who told them it was none of their business what he was doing in the wife's apartment. The husband then went alone to the wife's apartment and told her that he was going to take action against her, and the fact of the presence of the Sheriff in the wife's apartment was later corroborated both by her testimony and his.

"The wife, in her testimony, explained that she had been served with papers in a debt action on the 10th

and that she asked that Sheriff Jamieson contact her regarding this matter; she and the Sheriff both contend that the Sheriff had been there on a prior occasion that same night when they drove away from the apartment and were returning from that trip when observed by the husband entering the apartment, and that they drank coffee during the period they were observed to have been in her apartment and discussed facts regarding a case which the Sheriff said he was investigating. However, the Court notes that the Deputy who served the debt papers was never called as a witness, nor were any of the Sheriff's records ever presented to substantiate facts or matters allegedly discussed by them during this sojourn in the apartment. Our view of the explanations of both the defendant wife and of the Sheriff is that they are naive."

The first of the two witnesses for the defense was Mrs. Blankenship. She recounted the marital feuds, accusations, and counter-accusations prior to February 27, 1963, the recital of which she concluded with the comment: "So, Sheriff Jamieson advised me then that if he [Mr. Blankenship] wouldn't leave and I could no longer live with him in the same apartment, then he suggested that I leave. At this point the court interrupted to ask:

"Why would you consult with Sheriff Jamieson about a domestic matter, which is a lawyer's province and not the Sheriff's? What has he got to do with pulling hair and things like that?

THE WITNESS: Well, I was very, very upset, and there was no use in consulting the Mount Rainier police. I called them previously and they did nothing.

THE COURT: Had you ever previously consulted a lawyer about your domestic problem?

THE WITNESS: Yes, sir.

THE COURT: Why didn't you consult your lawyer, not Sheriff Jamieson?

THE WITNESS: Well, I can't answer that."

Mrs. Blankenship's explanation of Sheriff Jamieson's presence in her apartment in the late evening and early morning hours is rather confused. At one point she stated that a former attorney of hers had loaned her $500, which she had been unable to repay; that this former attorney issued a writ of attachment, served by a deputy sheriff, against the radio and television sets for sale in her Lanham store; and that she telephoned the Sheriff and demanded that he come over to her apartment and explain the reason for the attachment of her merchandise. At another point Mrs. Blankenship stated that the Sheriff had informed her that a shipment of stolen TV sets had appeared in the Lanham area, and that he wanted to come over to her apartment and discuss the situation with her, in the hope of learning if she knew which of the local TV merchants was acting as a "fence" for the "hot" goods. The defendant offered no satisfactory explanation, in response to questioning by the court, for the unorthodox time and place of discussing official police business:

"THE COURT: What was he doing coming around your place at one thirty in the morning on April 11th?

THE WITNESS: Well, you will have to ask him why he came, I mean, why that hour.

THE COURT: Doesn't that seem to you to be a strange hour for a Sheriff of Prince George's County to come by to discuss business with you? That didn't seem strange to you?

THE WITNESS: Well, it was strictly . . .

THE COURT: Didn't that seem strange to you [that] somebody would come by at that hour to talk about summons or papers getting served?

THE WITNESS: Well, Mr. Jamieson got there before one thirty.

THE COURT: All right, Mr. Powers."

When asked, "Now what was the purpose of going into the

apartment on that second occasion?"—"second occasion" referring to the Sheriff's return with Mrs. Blankenship after an unexplained ride in the Falcon station-wagon—Mrs. Blankenship replied:

> "A. He came back in and walked me back to the door and came in. And I asked him if he would like for me to make a pot of coffee. So, I made some coffee. We drank our coffee, then he left.
>
> "Q. And he was there just long enough for you to make the coffee and drink it?
>
> "A. Well, it takes a while for the coffee to perk and . . ."

The plaintiff had testified that the Sheriff and his wife were "hand in hand" while walking from the Falcon back to the wife's apartment. Mrs. Blankenship confirmed the fact that, after his encounter with the Sheriff, outside, her husband came to her apartment door and announced his intention to charge her with adultery in the pending divorce suit:

> "Q. Did anybody else come to your apartment door?
>
> "A. Yes. There was a knock on this door shortly after Mr. Jamieson left. And I said, 'Yes, who is it?' And at first there was no answer. So, I said again, 'Who is it?' And it was Mr. Blankenship, he called me by name. And I could hear some papers outside the door. And he said, 'I am taking you to Court (and) charging you with adultery with Sheriff Jamieson.' And I said, 'You go right ahead.' "

The second and last witness for the defense was Sheriff Jamieson. It is sufficient for the purposes of this case to say that he conceded most of the facts, heretofore set out, to be true, but emphatically denied any improper motive for being in Mrs. Blankenship's apartment, at the hours alluded to, and any sexual relationship with her while there. He did not explain the reason for the early-morning automobile ride together except to say: "We went to various locations in the Mt. Ranier area." He described the events within the apartment (after the ride) as follows: "We continued to discuss the information

she had given me, plus a discourse on the faults of her husband, and drank coffee. This took place in the dining room." He admits the confrontation with Mr. Blankenship and Mr. Robertson upon leaving the apartment (but didn't recall seeing plaintiff's brother), and admits making an obscene remark to Mr. Robertson after seeing the latter's Deputy Sheriff's badge. (An official letter was later sent by Jamieson to Robertson informing the latter that he was no longer a deputy sheriff of Prince George's County). When asked if "anything was said [by Mr. Blankenship] about why you were in the apartment with Mrs. Blankenship, his wife," the Sheriff replied, "No, sir, nothing." After a subsequent question he amended this reply to: "I think Mr. Blankenship said to me, 'I am going to charge you with adultery.' I ignored him."

In many of our sister states the issue of what constitutes corroboration of the testimony of a plaintiff-spouse in a suit for divorce, is somewhat unsettled. See 27A C.J.S., *Divorce,* sec. 136 et seq. In Maryland, however, the subject is now governed largely by statute and by rule of court. Maryland Rule S 75 provides:

> "A final decree of divorce shall not be passed upon the testimony of the plaintiff alone, nor shall the admissions of a defendant in an action for divorce be taken of themselves as conclusive proof of the facts charged as the ground of the action, but in all cases testimony of a person not a party in corroboration of the plaintiff shall be required."

We have had occasion to analyze the requirements of this Rule in *Comulada v. Comulada,* 234 Md. 287, 199 A. 2d 197 (1964), and, more recently, in *Taylor v. Taylor,* 238 Md. 312, 208 A. 2d 685 (1965). In those cases we traced the statutory origins of the Rule and alluded to the ways in which the Rule is more stringent in regard to corroboration than its predecessors. One effect of the Rule (effective January 1, 1959 as Rule 1190 f) was to change the decision in *Zulauf v. Zulauf,* 218 Md. 99, 145 A. 2d 414 (1958), that "the necessary corroboration in a divorce case might be furnished by admissions of the other spouse" (*Taylor,* at page 315 of 238 Md.). "* * * [I]t is

[now] clear that under the rule the admissions of the defendant spouse alone will not furnish the necessary corroboration of the complainant's testimony" (*ibid.*).

Appellant's counsel, in his brief and in oral argument, has strenuously insisted that the testimony of the plaintiff's brother and friend (as to the events of the nights of March 23rd and April 10th-11th) does not sufficiently corroborate that of the plaintiff, Mr. Blankenship, as to those events. In so arguing, we think that appellant erroneously assumes that the testimony of Sheriff Jamieson, the alleged paramour, is unavailable for the purpose of corroboration—an assumption apparently on the theory that the Sheriff could have been and perhaps, should have been, a "party" to the cause. Our research discloses that this assumption is untenable.

In England, it is true that "on a petition for divorce presented by the husband on the ground of adultery * * * the petitioner or respondent, as the case may be, must make every alleged adulterer a co-respondent unless he is excused by the Court on special grounds from so doing, or the adulterer is dead"; 12 Halsbury's Laws of England (3d ed.), *Divorce,* sec. 671. And if the adulterer is not already a party to the suit, he has a right "to appear and intervene in the proceedings"; *op. cit.,* sec. 657. See also 11 Halsbury's Statutes of England (2d ed.), pages 823, 835. However, as we pointed out in *Lickle v. Boone,* 187 Md. 579, 51 A. 2d 162 (1947), mandatory joinder of the alleged adulterer as a party, on the one hand, did not exist at the time of the Revolution; and an intervention, on the other hand, "was not allowed either at common law or in chancery" (page 582 of 187 Md.), either as an absolute right or as a privilege. The appearance of the paramour in divorce suits is authorized solely by statutes postdating July 4, 1776; and in the absence of such statutes, we have held that the adulterer is not only not a necessary party to the cause but is not even a proper one. As Judge Delaplaine said for the Court in *Lickle*:

> "In 1857 Parliament passed the Matrimonial Causes Act, which transferred divorce jurisdiction from the ecclesiastical courts to the Court for Divorce and Matrimonial Causes. That Act gave every husband seek-

ing a divorce the right to make the co-respondent a party, and empowered the court upon a wife's petition to order the co-respondent to be made a party. 20 & 21 Victoria, Ch. 85, Sec. 28. In 1907 Parliament enacted that any co-respondent charged with adultery in a suit for divorce has the right to intervene in the suit. In the United States some of the Legislatures have passed statutes giving co-respondents in divorce suits the right to intervene. For example, the New York Legislature in 1899 provided that any co-respondent has the right to appear and defend and to demand trial by jury, and in case the charge against him is not proved he is entitled to judgment for costs. [Case citations omitted]. But in Maryland there is no statute authorizing a co-respondent in a divorce suit to intervene" (at page 582-583).

We went on to hold in *Lickle* that "in no event can a co-respondent named in a suit for divorce maintain an appeal," for the reason that "he has no right to become a party to the suit by intervention" or otherwise (page 584). We denied standing to appeal also on the ground that the alleged paramour has "no direct interest in the issue whether the marital relation continues or is severed" (*ibid.*); while conceding that there was "considerable force in the co-respondent's argument" that his "reputation may be injured by a charge" of adultery, we said that it was one "which should be directed to the Legislature, rather than to the Judiciary of the State" (page 585). The Court concluded: "We, therefore hold that in the absence of statutory authorization, a co-respondent in a suit for divorce has no right to intervene as a party to the suit in order to protect his reputation."

Before leaving this issue we feel constrained to add a few words concerning the term "co-respondent", as that term is used in our cases. Ordinarily, the term denotes one joined as a party defendant in an equity suit, and connotes a person charged with adultery with the principal respondent in that proceeding. 9A Words and Phrases (Perm. Ed.), p. 364. However, the phrase also has a colloquial meaning, "generally accepted as meaning

a person guilty of illicit relations with the party named in an action for divorce," 18 C.J.S., p. 282. Although the word "co-respondent" might better be discontinued by the Maryland courts in light of the *Lickle* case, there is no ambiguity or prejudice to appellant from the use of the term by our predecessors; it is obvious that "co-respondent" has not been employed in its technical sense, to mean one joined as a party respondent in an equity suit, but rather in its descriptive or colloquial sense, as a synonym or euphemism for "alleged adulterer," "alleged paramour," and the like. Were it otherwise, a phrase such as "a co-respondent is not a party," would be completely devoid of meaning.

In summary we are of the opinion that the testimony of Sheriff Jamieson was properly used for the purpose of corroborating that of the plaintiff. We find that the actual facts testified to by the Sheriff coincide almost exactly with those observed and recounted by the plaintiff; the only significant difference between the two versions relates to the motive of the Sheriff in being in Mrs. Blankenship's company under the circumstances established by the record. Under such circumstances "the judge may disbelieve one portion of a party's [or witness'] testimony which is favorable to himself and believe another portion which is unfavorable to his case" (27A C.J.S., *Divorce*, sec. 136, p. 448).

We now turn to the question of whether the chancellor was clearly wrong in believing that the conclusions and inferences to be drawn from the plaintiff's testimony, *as corroborated,* were sufficient to lead "the unprejudiced mind of a reasonable and prudent man" to the conclusion that Mrs. Blankenship had committed an act of adultery. *Lickle v. Lickle,* 188 Md. 403, 407, 52 A. 2d 910 (1947). The rules of law applicable to the granting of a divorce on the ground of adultery have been so thoroughly enunciated by prior decisions of this Court that another extensive discussion of them would be unwarranted. See *Abare v. Abare,* 221 Md. 445, 157 A. 2d 427 (1960) and cases cited on page 450. *Dougherty v. Dougherty,* 187 Md. 21, 27-28, 48 A. 2d 451 (1946) illustrates the applicable legal standards:

"To prove adultery, the circumstantial evidence must clearly establish (1) a disposition on the part of the defendant and the paramour to commit adultery, and (2) an opportunity to commit the offense. After considering these and all other facts and circumstances in the case, the court then determines whether the evidence would convince an unprejudiced and cautious person of the guilt of the defendant."

The contentions made here are strikingly similar to those made by the appellant in the *Abare* case, *supra* (see p. 449 of 221 Md.). In *Abare* the alleged lack of sufficient evidence to prove an adulterous disposition was "the principal target of the appellant's attack" (p. 448). In that case "there was no evidence of any public display of intimacy or affection between [Mr. Abare and "Mary Ann"]". Mrs. Abare, the complaining party maintained a surveillance upon her spouse's residence, as Mr. Blankenship did here; and she testified that "Mary Ann" (identified as the "corespondent," see above) visited Mr. Abare's home on many occasions. There, as here, two such visits were corroborated by other witnesses. The testimony relating to the lateness of the visits is similar to that presented in the case at bar. There, as here, both the defendant-spouse and the alleged adulterer took the stand, substantially conceded the facts observed and recounted by the plaintiff-spouse, and denied any unworthy motive or any illicit sexual activity. And there, as here, the testimony of the third party in the "eternal triangle" was utilized by the Court in corroboration of that of the plaintiff. While acknowledging that in a number of cases, the evidence relative to the existence of an adulterous disposition had been "some more or less public display of intimacy observed by others," Chief Judge Brune for the Court stated that "these facts [recited in *Abare*] seem to us sufficient to support an inference of a disposition on the part of both the husband and the corespondent to commit the offense charged, *as well as* to show ample opportunity to commit it" (p. 451, emphasis supplied). At another point, this Court said: "The repeated visits of the corespondent to the husband's home show abundant opportunity, and we think the *circumstances of those visits* are sufficient to warrant an inference of a disposition to commit

adultery" (*ibid.*, emphasis added). Compare *Lickle v. Lickle, supra,* where we said that "while opportunity to commit adultery is not in itself sufficient to justify a finding of its commission, in the absence of evidence of a disposition to commit it, such a disposition may be inferred from the conduct of the parties and the surrounding circumstances" (p. 408 of 188 Md.). Indeed, we noted in *Abare* that displays of affection, such as those observed in *Steinla v. Steinla,* 178 Md. 367, 13 A. 2d 534 (1940), may often be less probative of a disposition to commit adultery than the late-evening visits of the *Abare* case, referred to above. Finally, in *Lickle v. Lickle, supra,* in rejecting the appellant's claim that "he cultivated merely a Platonic relationship" with Mrs. Boone, we noted (at p. 410) that several of appellant's answers to highly significant questions were "uncertain" or "evasive"; the same may well be said of several of the explanations of Mrs. Blankenship and Sheriff Jamieson which have been quoted near the beginning of this opinion. In view of his opportunity to see, hear, and communicate with these witnesses, we cannot say that the chancellor clearly erred in believing that those explanations were "naive," or were such as would appeal only to a naive and credulous mind.

As we have recognized in many similar cases, there remains a possibility that the adulterous spouse, Mrs. Blankenship, "has not committed the offense with which she is charged," *Hockman v. Hockman,* 187 Md. 340, 347, 50 A. 2d 136 (1946). However, "the courts of equity * * * must decide [issues of this kind] in accordance with what would appear to be the fact from all the evidence in the guarded judgment of just and reasonable men of ordinary experience" (*ibid.*). "* * * [T]hose who, by an open and continuous disregard of the usual moral and social conventions and decencies of life, have shown themselves indifferent to their marital obligations and to the opinion of those who know of their conduct" cannot complain if, supported by strong and convincing circumstantial evidence, the court might possibly reach a wrong conclusion. *Abare v. Abare, supra,* at page 452.

> *Decree affirmed; appellee to pay the costs.*