## PATZSCHKE v. PATZSCHKE

[No. 89, September Term, 1967.]

54

*Decided February 16, 1968.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*Bernard J. Sachs* and *Philip H. Goodman,* with whom were *Goodman, Meagher & Enoch* on the brief, for appellant.

*George W. Della,* with whom were *Hyman Ginsberg* and *Ginsberg & Ginsberg* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

The original bill in this case was filed by the wife, appellant (plaintiff-cross-defendant below), on August 5, 1966, charging the appellee, husband (defendant and cross complainant below), with the constructive desertion of the wife on or about July 28, 1966, eight days before the bill of complaint was filed. The husband filed a cross bill on September 2, 1966 charging adultery on the part of the wife. The court below denied the wife's bill for a divorce *a mensa et thoro* and granted the husband a divorce *a vinculo matrimonii* as prayed in his cross bill. It is from this decree that the wife appeals.

The parties were married in February of 1959. Two children were born of the marriage, being four and six years of age at the time this action was brought. The wife has an older son by a previous marriage.

The parties apparently enjoyed a normal marital relationship until approximately two months prior to the wife's filing of her bill for divorce. The wife was active in lodge work and cub scouts and enjoyed bowling with a women's bowling club, all of which consumed many evenings away from home, frequently until 12:00, 1:00 and 2:00 in the morning. Early in 1966 the husband noticed that on the occasion of one of the wife's bowling nights, her diaphragm was missing from the cupboard where she usually kept it. She returned that night about 2:30 a.m., at which time he proposed they have sexual relations to which she demurred and immediately fell asleep. The same sequence of events transpired the following night. This development marks the deterioration point in their marital bliss; the husband's suspicions of the wife having been aroused, from thence forth he checked the speedometer reading on the car when she left and returned and made more searching inquiries as to her activities.

The wife contends that the husband had always been indifferent to her, the home and the children, although the testimony shows that each week he turned over his weekly pay check of some $220 to her, retaining only $10 a week for himself. Fur-

thermore, they were financing the purchase of a $19,000 home and the husband had had several thousand dollars of improvements made during their occupancy.

He was certainly not a model husband, however up until the last two months they lived together, the testimony creates the image of an ordinary husband, a young father, confronted with normal problems of earning a livelihood, who is doing his best to provide a good home for his family. The testimony of the wife reveals that two months before the events occurred which forced her to leave the home, the marriage began to fall apart at the seams. She contends the husband repeatedly struck her, used foul language toward her, on occasions drank heavily, became a man of violent temper, was continually argumentative and began staying home from work.

The wife's testimony as to the husband's intemperate conduct received some corroboration from the testimony of the wife's mother, whose version cannot be viewed without taking into consideration the natural prejudice she would harbor in favor of her daughter. The testimony concerning the husband's misconduct was confined to the two months preceding the separation and, insofar as the mother-in-law's testimony is concerned, it actually referred to only three different occasions, one when the husband was leaning on the daughter when she was down, and she had to pound him on the back to make him get up. On another occasion she saw the husband twist her daughter's arm and choke her, and on the night of July 27 the husband climaxed his growing resentment with strange and bizarre conduct, which allegedly included violence toward the wife.

The night of July 27 and the morning of the 28th deserve special comment. On this occasion the husband, according to the wife, seemed to alternate between periods of dazed stupefaction and rage. He pulled the wife out of bed and allegedly threatened suicide, threatened to kill the wife and the children, drank whiskey, complained about bills, talked about how rich the wife would be from his insurance after he destroyed himself, threw himself down and rolled on the floor until tranquilizers were administered. On this occasion the police were called to the home by the wife, but left after talking to the husband, who informed them that all that had occurred was a do-

mestic quarrel. It should be noted that the police were not called as witnesses although most assuredly they would have had some report of the incident, if it had been as violent as depicted by the wife. The wife also complained of the influence that a Mr. Lumpkin had upon her husband. She cast him in the role of a Svengali, a brilliant man, usually to be found in a nearby drug store, who was psychoanalyzing her husband and convinced him he was a "scapegoat child" and a victim of the wife's machinations, who cast suspicion on the wife and on occasion administered tranquilizers to the husband.

A neighbor lady, Mrs. Jones, a friend of the wife's, also testified to seeing bruises on the wife on one occasion and also as to the husband's growing indifference, but her testimony should be characterized as restrained.

The husband, who testified that his mother-in-law drank considerably, categorically denied that he had ever inflicted any physical violence on the wife. The husband's uncle, who was a frequent visitor to the home and who had assisted the parties financially, including giving the wife a new kitchen floor for her birthday, described the husband as a man who never let his children want for anything. He was not aware of any difficulties between his nephew and the wife, and the wife had never complained to him of the husband's conduct.

On the morning of July 28, 1966 the wife took the children and left the home going to her former mother-in-law's.

The lower court dismissed the wife's bill of complaint, and in our opinion was correct in so doing. See discussion in *Murphy v. Murpy,* 248 Md. 455, 237 A. 2d 523 (1967).

The testimony given in support of the husband's cross bill is the only matter in this case which gives us concern. The testimony is virtually without contradiction that the wife followed a pattern of frequently leaving the husband and the children at home and traveling about at night to lodge meetings and to bowl and that she usually returned between midnight and 2:00 a.m. It is uncontradicted that the speedometer on occasions showed 50 miles to have been put on the car during the evenings she used it. Although the wife took the witness stand she made no attempt to explain or clarify the rather significant

accusation by the husband's testimony concerning the missing diaphragm.

However, it is the testimony of the two private detectives whom the husband employed to follow the wife, after she had left on July 28, 1966, to which we must pay particular attention.

The testimony of the detectives, which laid the foundation of an adulterous disposition on the part of the wife, consisted of the observation of the wife's visits to taverns with a male companion, whose name is unknown, and who is described as being between 30-35 years of age, 5 feet 8 inches to 5 feet 10 inches tall and weighing 170-180 pounds. On August 13, 1966 the wife was observed visiting the Bay Tavern with this man traveling in her brother's white Pontiac Grand Prix. At 11:40 p.m. the couple left the Bay Tavern and the detectives lost them in traffic. However, the detectives then waited at the residence at 1517 Filbert Street where Mrs. Patzschke was residing, and the Pontiac Grand Prix had not returned when the detectives stopped surveillance at 12:40 a.m. On August 26, the detectives observed the wife in the companionship of the same man riding in a white Cadillac driven by the wife on Patapsco Avenue. They were observed kissing in the car while it stopped for a traffic light. They later got out of the car on Hanover Street and walked hand in hand to the Bolero Bar. Later, they drove to Friedman's Bar and parked on the parking lot for some time and were observed embracing and kissing. Several persons leaving the bar passed the car while this was going on. On Patapsco Avenue they stopped briefly at the top of a hill and kissed again, then continued on. The detectives lost them in traffic; however, the detectives checked the residence where the wife was staying and the white Cadillac she was driving had not returned by 3:30 a.m. The night of August 30, and early morning of August 31 is when the alleged adultery occurred. On that occasion the detectives, one accompanied by his wife, followed Mrs. Patzschke in two cars. Mrs. Patzschke and the same male companion were in the white Cadillac and were observed parking in a deserted, wooded area, where the car was almost obscured by foliage, from 12:15 a.m. until 2:00 a.m.

The wife flatly denied being guilty of any adulterous con-

duct, and by way of defense to the accusations regarding her whereabouts and conduct on the night of August 30 and early morning of the 31st, during which time the detectives placed her with a paramour, produced a witness in the person of a Mrs. Brown, a long standing friend of her mother's. Mrs. Brown testified that after many months of not being in contact with the wife's mother, she drove from her home in Irvington to Curtis Bay where the wife resided with her mother and casually dropped in at 11:30 on the night of August 30. She also testified that she remained with the appellant and her mother until 2:20 a.m., eating sandwiches, drinking coffee and conversing. The lower court described Mrs. Brown's testimony thusly: "It is just absolutely incredible, and the Court does not believe it."

In *Matakieff v. Matakieff,* 246 Md. 23, 30, 226 A. 2d 887, 890 (1967), we said:

> "The elements required for circumstantial evidence to sustain proof of adultery have often been stated by this Court. In *Dougherty v. Dougherty,* 187 Md. 21, 48 A. 2d 451 (1946), Judge Delaplaine speaking for the Court, said at pp. 27-8:
>
>> 'To prove adultery, the circumstantial evidence must clearly establish (1) a disposition on the part of the defendant and the paramour to commit adultery, and (2) an opportunity to commit the offense. After considering these and all other facts and circumstances in the case, the court then determines whether the evidence would convince an unprejudiced and cautious person of the guilt of the defendant.'
>
> *Blankenship v. Blankenship,* 239 Md. 498, 510, 212 A. 2d 294, 300 (1965) ; *Abare v. Abare,* 221 Md. 445, 450, 157 A. 2d 427, 430 (1960) ; *Pohzehl v. Pohzehl,* 205 Md. 395, 406, 109 A. 2d 58, 63 (1954) ; *Burger v. Burger,* 204 Md. 495, 499, 104 A. 2d 923, 925 (1954) ; *Lickle v. Lickle,* 188 Md. 403, 407-8, 52 A. 2d 910, 911 (1947) ; and *Hockman v. Hockman,* 187 Md. 340, 344, 50 A. 2d 136, 138 (1946)."

With regard to actions which may offer proof of an adulterous disposition, this Court in *Riley v. Riley,* 239 Md. 363, 366, 211 A. 2d 748, 750 (1965), pointed out that where a spouse and a member of the opposite sex are seen together on various occasions, under circumstances which were explainable and innocuous, such occurrences could not of themselves be considered conduct warranting the inference of an adulterous disposition. The Court stated that such a disposition must necessarily depend on the facts of each case. We have usually held that for such a disposition to be established, the evidence relied upon must reflect some public display of intimacy or indifference to proprieties, and must be observed by others. *Abare v. Abare,* 221 Md. 445, 450, 157 A. 2d 427 (1960); *Hockman v. Hockman,* 187 Md. 340, 50 A. 2d 136 (1946); *Steinla v. Steinla,* 178 Md. 367, 13 A. 2d 534 (1940).

In the instant case we have the observation of the private detectives on the night of August 13, at which time the wife and a male companion were visiting taverns and riding in an automobile at a late hour together. Although, of itself this incident may not have significance, it gains more weight when coupled with the actions of the wife and the same companion on August 26, when again they were observed visiting taverns together, walking on the street holding hands, kissing and embracing both on a parking lot and while driving on a public thoroughfare. Furthermore, we think that in conjunction with this, one cannot ignore the previous pattern established by the wife's frequent evenings away from home until 12:00 to 2:00 a.m.

With regard to the observations made by the detectives on the night of August 30 and early morning of the 31st, at which time the husband contends the adultery took place, there is no question but that the opportunity for adulterous conduct was present on this occasion. *Matakieff v. Matakieff, supra* and cases cited therein; also *Kremelberg v. Kremelberg,* 52 Md. 553 (1879).

It is necessary that we comment on the credibility of the evidence supplied by the use of private detectives. In *Hockman v. Hockman,* 187 Md. 340, 345, 58 A. 2d 136, 138 (1946) we stated:

"It is unquestionably true that the testimony of pri-

vate detectives is not entitled to any more weight than that of the defendant and co-respondent, where they conflict. The reason for this rule is that they are all interested witnesses, the detectives to justify their employment by finding what they are employed to find, and the defendant and co-respondent to establish their innocence. *German v. German,* 137 Md. 424, 112 A. 789. Generally, the testimony of detectives is not reliable when it is uncorroborated by any circumstance in the case and does not connect the defendant with the offense. *McCleary v. McCleary,* 140 Md. 659, 663, 118 A. 133; *Bailey v. Bailey,* 181 Md. 385, 30 A. 2d 249, *Steinla v. Steinla,* 178 Md. 367, 13 A. 2d 534. But in this case the detective, who has an established detective agency in the Equitable Building, was accompanied by his wife when he followed Mrs. Hockman and Ridenbaugh on their motor trips, and the investigation was done thoroughly."

See also *Matakieff v. Matakieff, supra.*

In the instant case perhaps there is not as much corroboration of the testimony given by the private detectives as we would normally like to see in order to support the grounds for adultery, and it may be close to the "irreducible minimum," mentioned by Judge Henderson in *Stevens v. Stevens,* 186 Md. 612, 617, 47 A. 2d 752, 754 (1945).

However, upon an analysis of the record and examining the testimony of the private detectives, we are of the opinion that their testimony is entitled to belief.

We cannot isolate their findings from the background previously provided by the wife. She established a pattern of frequent evenings out until the early hours of the morning, unaccompanied by her husband; on such occasions she placed substantial mileage on the car she was using, beyond that normally required to transport her to and from her legitimate meeting places; nor can we overlook her predilection to visit taverns escorted by someone other than her husband. True, much of this happened over the weeks and months preceding the time the detectives started to follow her, however, we think such

evidence is material in providing a background compatible with the evidence later adduced by the detectives.

What also makes this case somewhat different from other cases wherein the search for corroborative evidence to support that supplied by private detectives is felt necessary, is the fact that the evidence supplied by the detectives gains stature from the patent attempt of the wife to provide herself with what the lower court described as an "alibi" for her whereabouts on the night of August 30 and early morning of the 31st. The lower court had the opportunity to observe the demeanor of the witnesses and the manner in which they testified. The lower court characterized the testimony of the chief "alibi" witness, Mrs. Brown, as "absolutely incredible." It further assayed the testimony of the private detectives as follows:

> "It is given even greater weight than it would be ordinarily by the effort to alibi that night, an unsuccessful alibi as the Court has determined. I believe the testimony of Mr. Skipper and Mr. Maphis [the two detectives] as to what happened that night."

The use of such an obvious stratagem as a desperate abili, assuming the lower court's assessment to be correct, and we so believe, amounts to a damaging failure on the part of the wife to explain her whereabouts at the time the adultery was said to have occurred.

For the reasons stated in this opinion we think the Chancellor was correct in his findings and attendant application of the law. The decree of the lower court granting a divorce *a vinculo matrimonii* to the husband should be affirmed.

*Decree affirmed, appellee to pay costs.*