## BREAULT *v.* BREAULT

[No. 251, September Term, 1967.]

174

*Decided May 29, 1968.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, FINAN and SINGLEY, JJ.

*Ferdinand J. Mack,* with whom were *Shadoan & Mack* on the brief, for appellant.

No brief filed for appellee.

MARBURY, J., delivered the opinion of the Court.

This appeal comes from the Circuit Court for Prince George's County where the chancellor, Judge Mathias, by decree dated May 18, 1967, denied the appellant a divorce *a vinculo matrimonii* and custody of two minor children. The bill of complaint alleged that the plaintiff and defendant were married in Miami, Florida, on April 4, 1954, and that thereafter two children, Andrew D. Breault, age nine, and Steven D. Breault, age six, were born of the marriage. It went on to allege that on a number of occasions the defendant had committed adultery. The defendant answered denying the allegations of adultery and praying that custody of the children be awarded to her.

There was no evidence in this case that goes to prove any actual adulterous act. Therefore, the commission of adultery would have to be inferred by the circumstances surrounding the conduct of the appellant-wife, Erica E. Breault, and her alleged paramour, Coral I. Thomas.

The facts of the case are substantially undisputed and the evidence showed them to be as follows: Mrs. Breault had known Mr. Thomas since 1958 or 1959. Since that time Mr. Thomas had been employed by the Sheraton Park Hotel where he was in charge of serving banquets and private parties. Mrs. Breault, who is a waitress, had worked off and on at the Sheraton Park since 1958-59 as a member of the waitresses union. During the summer of 1965 while Mrs. Breault was in Switzerland visiting relatives, Mr. Thomas wrote to her asking if she would accept full time employment in the hotel when she returned. Mrs. Breault answered and signed a contract of employment in August or September of 1965. From time to time Mrs. Breault told her husband what a "nice guy" Mr. Thomas was and also related to him that there was a rumor at the hotel that they were "boyfriend and girlfriend" but assured him that the rumor was unfounded.

The first signs of marital unrest were noticed by Mr. Breault in December 1965 when he observed his wife to be unusually edgy but concluded that this was because of long hours at work. However, in January 1966 she told him that she could no longer continue the marriage; that she had "sex up to here"; and that she wanted a divorce. The couple subsequently consulted a marriage counselor who was unsuccessful in effecting a reconciliation, as was a family doctor who, at Mr. Breault's request, talked to Mrs. Breault in an effort to change her mind.

Temporarily unable to cope with the situation Mr. Breault went on a ten day vacation in early February of 1966 and when he returned he was confronted by his wife with a letter from her attorney asking that he come to his office in reference to a separation. On March 6, 1965, Mr. Breault moved from their apartment at 7350 Forest Road, Kent Village, Hyattsville, and moved into a one-bedroom apartment in the same block at 7314 Forest Road. Subsequently a property settlement and separation agreement was executed by Mrs. Breault on March 21, 1966,

and by Mr. Breault on April 19, 1966, by which the parties agreed each to live separate and apart without interference from the other; to a settlement of rights in property owned by them; and to the support and maintenance by the husband of their minor children, whose custody was to be vested in the wife with visitation rights to be enjoyed by the husband.

After the separation and while Mrs. Breault was still living at the Forest Road address, Mr. Breault would visit the children and sometimes have coffee with his wife.

On June 15, 1966, Mr. Breault discovered that his wife was moving from her apartment and ascertained, through the telephone company, that she was moving to 2912 Barrister Lane, Belair, Bowie. Although he was told through an intermediary that he was not wanted in the new home, the appellant continued to see the children after the move although he picked them up and returned them outside of the house. Mr. Breault was never consulted concerning the purchase of the house in Belair and was not asked for any help in regard to its purchase.

While there is some conflict in the testimony as to who actually located the house, it was purchased through the joint efforts of Mr. Thomas and Mrs. Breault and was titled in Mr. Thomas' name and that of Mrs. Beault's attorney, as joint tenants. The purchase contract was not in evidence but testimony revealed that it was signed in March of 1966 either by Mrs. Breault or Mr. Thomas and Mrs. Breault made a $500 deposit at that time. On April 14, 1966, the time of settlement, Mr. Thomas advanced approximately $5,000 in cash as was required for the purchase. No note was given by Mrs. Breault to secure this advance but she testified that she had sufficient funds in a Swiss bank to effect the settlement but that it would have taken a week or two to have obtained these funds. Mr. Thomas had separated from his wife in January of 1966. At the time of the trial in this case divorce proceedings between the Thomases were pending.

Mrs. Breault testified that in June or July of 1966 she and Mr. Thomas discussed the possibility of his seventeen year old daughter, Carol, moving into the Belair home. The initial arrangement was for only Carol to move in but because he wanted to see and visit his daughter, the final arrangement was for both

Mr. Thomas and his daughter to move into the Barrister Lane address, which they did in July of 1966.

The house had four bedrooms, two upstairs and two downstairs, and the testimony was that Mrs. Breault's two young boys occupied the large upstairs bedroom and Mr. Thomas' daughter occupied the small upstairs bedroom. Mrs. Breault occupied the large downstairs bedroom at the front of the house and Mr. Thomas slept in the small downstairs bedroom at the rear of the house. Mrs. Breault cleaned the entire house, did Mr. Thomas' laundry and woke him up, fixed him coffee, and had his dinner ready when he returned at night, which was usually between 10:00 p.m. and midnight. They occasionally had a drink together and if he came home early they might eat together. After they had had their showers they dressed in pajamas and robes. The daughter had a propensity for watching late movies on television and was usually the last to go to bed. It was stipulated by counsel that the Breault children if called to testify would say that occasionally during the night they would come downstairs and sleep with their mother. Mr. Thomas and Mrs. Breault exchanged gifts on their birthdays and at Christmas. She asked him for advice and often relied upon it. They had occasionally gone shopping together and once before Hallowe'en went out to buy a pumpkin and observe the autumn foliage. They had gone to dinner together on three occasions and had taken the children swimming, fishing and fossil hunting. They kissed at a New Year's Eve party in 1967 and once under the mistletoe at Christmas. There was testimony by detectives that Mrs. Breault and Mr. Thomas were seen sitting close while in a car and that at a shopping center she took his hand while walking across a parking lot. One detective testified that while riding past the Barrister Lane home he saw Mrs. Breault lean into Mr. Thomas' car and kiss him, after which Mr. Thomas drove away.

Betty Seidel, a witness for the plaintiff, testified that Mrs. Breault told her that the separation did not mean that she would never marry again or that she was through with men, "but if she wanted to do any tom-catting she would do it on her own." Mrs. Seidel also testified that she was a close friend of the Brea-

ults, that Mrs. Breault was a good mother and that she did not think she was the type to go out with another man.

Mrs. Breault's and Mr. Thomas' testimony was to the effect that she gave him $121.14 per month to pay off the mortgage and that he paid her $80.00 a week for room and board for himself and his daughter. They agreed that when Mrs. Breault had repaid Mr. Thomas the $5,000 that he put up, that title to the house would be transferred to her name.

It is the established law of this state that where divorce is sought on the ground of adultery that the adultery may be shown by circumstantial evidence and that an actual act of adultery need not be witnessed. *Patzschke v. Patzschke,* 249 Md. 53, 238 A. 2d 119; *Riley v. Riley,* 239 Md. 363, 211 A. 2d 748; *Swoyer v. Swoyer,* 157 Md. 18, 145 Atl. 190. However, to establish adultery the circumstantial evidence must clearly establish (1) a disposition on the part of the defendant and the paramour to commit adultery, and (2) an opportunity to commit the offense. *Patzschke v. Patzschke, supra; Blankenship v. Blankenship,* 239 Md. 498, 212 A. 2d 294; *Dougherty v. Dougherty,* 187 Md. 21, 48 A. 2d 451.

The trial court, in denying the plaintiff's bill for divorce did not rule squarely on whether opportunity had been proven to its satisfaction but reached its decision primarily on the ground that the disposition to commit adultery had not been shown sufficiently. As to the question of opportunity, suffice it to say that two adult persons living together for about a year would have ample opportunity for intimacy if they were so disposed.

This brings us to consideration of the question whether there was, on the part of both Mrs. Breault and Mr. Thomas, disposition to commit adultery. The chancellor below stated emphatically that he considered very important the fact that he had the opportunity to observe Mrs. Breault and Mr. Thomas on the stand and was impressed by the straightforwardness and honesty of his testimony. With due deference to the chancellor, we find, after examination of the testimony adduced before him, he was clearly wrong in believing the direct testimony of Mrs. Breault and Mr. Thomas as against the circumstantial evidence produced against them.

In the case before us, Mrs. Breault referred to "what a nice guy" Thomas was; their association and conduct was such that at the hotel they were regarded as "boyfriend and girlfriend." They bought a house together. The children slept upstairs, Mrs. Breault and Thomas had bedrooms downstairs and shared a bath in which they showered, and then in pajamas and robes drank and ate together. She awakened him and gave him coffee and had his dinner ready when he came home between 10:00 and 12:00 p.m. They went out together as a couple, sometimes with the children. They were seen "sitting close" in a car, and she held his hand while walking across a parking lot. She leaned into his car and kissed him goodby before he drove away.

In the court below the chancellor cited the case of *Laccetti v. Laccetti,* 245 Md. 97, 225 A. 2d 266, saying that, "While the facts in that case are not identical, the court is of the opinion that they are sufficiently similar that this Court does not ignore it." In that case the wife and alleged paramour were living in the same house along with their respective children in Montgomery County, having previously occupied another home together in the same county. Both were married and separated at the time when they lived together and both denied any act of sexual intercourse between them. The wife's twenty-two year old daughter testified that she did not know where her mother slept. Thurston, the alleged paramour, testified to the effect that the arrangement was simply to provide care for his children and that he and the appellant wife had an agreement whereby she did the ironing and cooking and cared for the children, and that he paid the bills.

In that case the lower court dismissed the wife's bill of complaint on the ground of recrimination, finding that the evidence conclusively established that the plaintiff and Thurston had had sexual relations. This Court reversed, finding that "There was not an iota of evidence to prove a disposition on their part, or on the part of either of them, to commit the offense." We think on the facts this case and *Laccetti* are clearly distinguishable and that the chancellor here was clearly erroneous in reaching the conclusion that he did.

In *Blankenship v. Blankenship, supra,* at page 511, Judge Barnes speaking for this Court said:

"As we have recognized in many similar cases, there remains a possibility that the adulterous spouse, Mrs. Blankenship, 'has not committed the offense with which she is charged,' *Hockman v. Hockman,* 187 Md. 340, 347, 50 A. 2d 136 (1946). However, 'the courts of equity * * * must decide [issues of this kind] in accordance with what would appear to be the fact from all the evidence in the guarded judgment of just and reasonable men of ordinary experience' (*ibid*). '* * * [T]hose who, by an open and continuous disregard of the usual moral and social conventions and decencies of life, have shown themselves indifferent to their marital obligations and to the opinion of those who know of their conduct' cannot complain if, supported by strong and convincing circumstantial evidence, the court might possibly reach a wrong conclusion. *Abare v. Abare, supra,* at page 452 [221 Md. 445, 157 A. 2d 427]."

The evidence in the present case was strong and compelling and not inherently improbable. The only rebuttal to that evidence offered by the appellee was the testimony of Mrs. Breault and Mr. Thomas denying sexual intercourse. In the face of the facts disclosed in the record before us such a denial is not convincing.

The question of custody of the Breault children was not pressed on appeal and it was not argued orally or in the brief. The record discloses undisputed testimony that Mrs. Breault has always treated the children well and has been a good mother. Furthermore, although it is not controlling, the agreement between the parties specifically gave custody of the children to her, with the privilege of visitation to be accorded Mr. Breault. In cases involving the custody of a minor child the welfare of the child is the overriding consideration and the facts in each individual case will be considered by the courts in making a determination of this matter.

Where the children are young, as is the case here, it is usually preferable to have them placed with their mother. The only factor here militating against this result is the fact that the record before us indicates strongly that the mother has com-

mitted adultery. While this is an important consideration the record indicates, and the chancellor recognized below, that she had terminated the relationship with Mr. Thomas. In view of this fact and her past record as a good mother, we hold that the custody of the minor children should remain with her, with visitation rights in the husband as provided by the chancellor's decree.

On the record before us we conclude that that portion of the decree which denied the husband a decree of divorce *a vinculo matrimonii* must be reversed and the divorce granted, and the portion thereof awarding custody to Mrs. Breault of the minor children should be affirmed, so that the cause will be remanded for the passage of a decree in conformity with this opinion.

> *Decree reversed in part and affirmed in part, and the cause remanded for the passage of a decree conforming with the views expressed in this opinion. Costs to be paid by the appellant.*