# GOLDSCHMIEDT *v.* GOLDSCHMIEDT

[No. 341, September Term, 1969.]

*Decided May 6, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SMITH and DIGGES, JJ.

*Harvey B. Steinberg,* with whom were *Steinberg & Seres* on the brief, for appellant.

*Walter S. Furlow, Jr.,* with whom were *Fred Warren Bennett* and *Lambert, Furlow, Elmore & Heidenberger* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Appellant, Ursula N. Goldschmiedt, sued her husband, Harry R. Goldschmiedt, the appellee, for custody of the minor child of the parties and child support. He countered with a cross-bill for divorce *a vinculo matrimonii* on the grounds of adultery. The chancellor granted the husband the divorce, awarded custody to the husband and denied the wife's motion for costs and counsel fees on appeal. We shall affirm the action of the chancellor.

The courts have long recognized that it is a rare situation when proof of the actual act of adultery is produced. In *Breault v. Breault,* 250 Md. 173, 242 A. 2d 116 (1968), Judge Marbury said for the Court:

> "It is the established law of this state that where divorce is sought on the ground of adultery that the adultery may be shown by circumstantial evidence and that an actual act of adultery need not be witnessed. *Patzschke v. Patzschke,* 249 Md. 53, 238 A. 2d 119; *Riley v. Riley,* 239 Md. 363, 211 A. 2d 748; *Swoyer v. Swoyer,* 157 Md. 18, 145 Atl. 190. However, to establish adultery the circumstantial evidence must clearly establish (1) a disposition on the part of the defendant and the paramour to commit adultery,

and (2) an opportunity to commit the offense. *Patzschke v. Patzschke, supra; Blankenship v. Blankenship,* 239 Md. 498, 212 A. 2d 294; *Dougherty v. Dougherty,* 187 Md. 21, 48 A. 2d 451." *Id.* at 178.

In this case the wife presents the interesting theory that "[a]ssuming that an adulterous disposition was proven to the court's satisfaction, the court erred in finding there was ample opportunity to commit adultery based on the fact that the wife lived alone with her seven-year-old child." It is undisputed that there was a frequent male visitor to the home of the wife. He is married and has a family. Mrs. Goldschmiedt herself testified that he usually stopped by her home after work getting there at 6:00 or 6:30 P.M. and staying "about an hour", when they occasionally had dinner together and occasionally had a drink together. According to her statement he has embraced her on occasion and kissed her when she "[felt] very blue and very down, very discouraged." There was a private detective who described one such embrace as "kissing and hugging and a clinch for almost five minutes". A neighbor called as a witness by the wife was obliged to admit having seen the embraces. Mrs. Goldschmiedt admitted that she "might have" embraced and kissed the gentleman in the driveway of the home where she was living after she and her husband separated.

The alleged paramour, according to Mrs. Goldschmiedt, came to her house "four or five times a week" to "[m]ow the lawn, fix the lawn mower, carry the garbage out" and do "innumerable things". Mrs. Goldschmiedt and the alleged paramour own a racing car together. They have been out of town on at least three weekends for the purpose of attending automobile racing events. They, of course, protest their innocence on each and every such occasion.

The argument put forth by Mrs. Goldschmiedt, that the chancellor erred in concluding there was opportunity for adultery because the wife was living alone with a

seven-year-old child, is not convincing. The chancellor had the opportunity to hear the witnesses and to observe their demeanor. We cannot say that he was clearly in error in concluding that there was the disposition to commit the act of adultery (as Mrs. Goldschmiedt apparently admits) and the opportunity to commit the act. Maryland Rule 886 a. To say that there was not opportunity would be to deny the obvious.

Mrs. Goldschmiedt in her brief addressed herself almost entirely to the matter of divorce and in the oral argument the time was devoted almost entirely to the issue of custody. Custody of the minor child was awarded to the husband.

This Court has said many times that in the matter of custody the ultimate test is the best interest and welfare of the child. *Krebs v. Krebs,* 255 Md. 264, 266, 257 A. 2d 428 (1969) ; *Fanning v. Warfield,* 252 Md. 18, 248 A. 2d 890 (1969) ; *Shanbarker v. Dalton,* 251 Md. 252, 257, 247 A. 2d 278 (1968) ; *Heaver v. Bradley,* 244 Md. 233, 242, 223 A. 2d 568 (1966) ; and *Snow v. Watson,* 240 Md. 712, 713, 213 A. 2d 748 (1965). In this case the chancellor appears to have given very careful consideration to these points. In addition to the testimony of the witnesses produced by the parties the court ordered and received a separate investigation by the court's investigator.

The court investigator interviewed a number of individuals including a baby-sitter and a nursery school operator who were called as witnesses by Mr. Goldschmiedt. Neither of these was particularly complimentary to Mrs. Goldschmiedt. Mr. Goldschmiedt testified that when he and his wife were living together it was he who was obliged to get the boy up in the morning, give him breakfast before he left for kindergarten, dress him and see that he got to school. The wife left home at 7:00 A.M. and the normal time for the child to get up in the morning was 7:30 A.M. The nursery school operator testified relative to arrangements there:

> "He was to be picked up at his residence, taken
> to the nursery, kept there, and taken home.

> Should no one be there to receive him, which was frequently the case, his father would return to the nursery to call for him.
>
> "Then this arrangement changed, and they found a baby-sitter, and the nursery was responsible for taking Christopher, rather than home, to the [sitter's] house."

The baby-sitter, when asked if Mrs. Goldschmiedt were "a fit and proper person to have custody of a minor child", said, "I don't know what 'fit' means. I don't know anything to her character. It seems as though the father was the child's whole life."

On the issue of custody Maryland Rule 886 a is applicable. There clearly was evidence before the chancellor upon which he could have reached the conclusion he did reach. We cannot say that he was in error.

The chancellor directed Mr. Goldschmiedt to pay $300.-00 to Mrs. Goldschmiedt for her solicitor's fee in the trial in the circuit court. After the order for this appeal was filed, a petition was submitted to require Mr. Goldschmiedt to pay the costs incident to the appeal, including the cost of the transcript in the circuit court, the cost of printing the brief and an attorney's fee. Mr. Goldschmiedt replied in opposition pointing out that Mrs. Goldschmeidt was earning approximately $9631.00 per year as an employee of the United States Government and that she had sufficient funds to prosecute her appeal. The chancellor passed an order dismissing the motion relative to costs and fee.

Mrs. Goldschmiedt here purports to appeal that action. The record discloses no order for appeal from the order of the chancellor dismissing the petition for costs and counsel fees on appeal. Therefore, the matter is not before us. Were the matter properly before us, however, we could not say on the basis of the relative income and resources of the parties that the chancellor abused his discretion.

> *Decree affirmed, appellee to pay the costs.*